MICHEL, Circuit Judge.
 

 Douglas L. Ishida (Ishida) appeals from the April 22, 1994 decision of the United States Court of Federal Claims, 31 Fed.Cl. 280 (1994), granting summary judgment in favor of the United States and sustaining the Department of Justice’s (DOJ) denial of Ishida’s application for compensation under the Civil Liberties Act of 1988 (Act), 50 U.S.C.App. §§ 1989,
 
 et seq.
 
 (1988 & Supp. V 1993). Because the DOJ’s decision denying compensation to Ishida, and, inferentially, to all other children born to parents of Japanese ancestry who were excluded from their family homes in prohibited military zones during the statutory period (the period beginning on December 7, 1941, and ending on June 30, 1946) is based on an interpretation of the Act that is contrary to the unambiguous intent of the Congress, we reverse. We hold that such children are entitled to compensation because they were “otherwise deprived of liberty” within the meaning of the Act when they were excluded by law from their parents’ “original place of residence” “as a result of’ Executive Order 9066, 3 C.F.R. 1092 (1938-1943) (hereinafter Executive Order 9066) and Act of March 21, 1942, 56 Stat. 173, making it a criminal offense to violate Executive Order 9066 by returning to their family homes in areas that had been declared prohibited military zones pursuant to Executive Order 9066.
 

 BACKGROUND
 

 A
 
 Wartime Exclusion Policy
 

 On February 19, 1942, ten weeks after Pearl Harbor, President Franklin D. Roosevelt issued Executive Order 9066 which authorized military commanders to establish military areas (prohibited military zones) in the United States and exclude therefrom any or all persons, citizens and aliens, as a security measure. However, only individuals of Japanese ancestry actually became the object of mass exclusion, relocation, and detention actions, despite the fact that no documented acts of espionage, sabotage or fifth column activity were shown to have been committed by any identifiable American citizen of Japar nese ancestry or permanent resident Japanese alien on the West Coast.
 
 See
 
 Personal Justice Denied Part 2: Recommendations: Report of the Commission on Wartime Relocation and Internment of Civilians 51 (1983) (Personal Justice Denied). No mass exclusion, relocation or detention was ordered against American citizens or resident aliens of German or Italian descent.
 

 On March 2, 1942, General DeWitt issued Public Proclamation No. 1 establishing Military Areas 1 and 2 blanketing broad areas of the West Coast and announcing the imminent expulsion and exclusion of persons of Japanese ancestry from Military Area No. 1. “Thenceforth all Americans of Japanese blood, regardless of their citizenship and place of birth, were momentarily expecting to be evicted from their homes within the restricted area.”
 
 Sonoda v. United States,
 
 154 Ct.Cl. 130, 134-35, 1961 WL 8731 (1961) (dissenting opinion). On March 29, 1942, the military command issued Public Proclamation No. 4 “whereby persons of Japanese ancestry were prohibited from leaving parts
 
 *1227
 
 of the West Coast area because the Government was preparing to forcibly relocate them later.” 54 Fed.Reg. 34,157, 34,159 (Aug. 18, 1989). Between the issuance of Public Proclamation Nos. 1 and 4, many Japanese Americans then living in Military Area No. 1, to avoid imminent mandatory detention, fled from them West Coast homes. Japanese Americans who evacuated the West Coast prior to March 29, 1942, were considered “voluntary” evacuees, in contrast to those later forcibly relocated to internment camps. These evacuees, however, did not have unconditionally free movement into the interior, but were required to register their anticipated destinations with a sub-agency of the military, the federal Wartime Civil Control Administration.
 

 The government of the United States authorized and executed this policy to exclude, forcibly relocate or detain all Japanese Americans (citizens and resident aliens), solely because of their national ancestry, without the individualized review procedure employed in actions taken against suspected enemy aliens of other nations. Congress, fully aware of this policy of exclusion, relocation, and detention, supported it by enacting a statute on March 21, 1942, making criminal any violation of orders or proclamations issued pursuant to Executive Order 9066. Act of March 21, 1942, 56 Stat. 173 (penalty for violation of restrictions or orders with respect to persons entering, remaining in, leaving, or committing any act in military areas or zones). Thus, our government made it a criminal offense for Japanese Americans to live in their homes, to raise their families in the communities they had chosen and established, and to return to those communities and homes.
 

 B. Congressional Mandate for Redress
 

 In 1980 Congress established the Commission on Wartime Relocation and Internment of Civilians (Commission) to investigate and document the impact of Executive Order 9066 on Japanese American citizens and permanent resident aliens.
 
 See generally
 
 Personal Justice Denied. The Civil Liberties Act of 1988 enacts the recommendations of the Commission, which include a formal statement of apology to individuals excluded from their homes under Executive Order 9066 because of their Japanese ancestry and a one-time payment of $20,000 to each “eligible” individual. Section 1989b-7 of the Act states:
 

 (2) the term “eligible individual” means any individual of Japanese ancestry who is living on the date of the enactment of this Act [Aug. 10, 1988] and who, during the evacuation, relocation, and internment period—
 

 (A) was a United States citizen or a permanent resident alien; and
 

 (B) (i) was confined, held in custody, relocated,
 
 or otherwise deprived of liberty
 
 or property as a result of—
 

 (I) Executive Order Numbered 9066, dated February 19, 1942;
 

 (II) the Act entitled “An Act to provide a penalty for violation of restrictions or orders with respect to persons entering, remaining in, leaving, or committing any act in military areas or zones”, approved March 21, 1942 (56 Stat. 173); or
 

 (III) any other Executive order, Presidential proclamation, law of the United States, directive of the Armed Forces of the United States, or other action taken by or on behalf of the United States or its agents, representatives, officers, or employees, respecting the evacuation, relocation, or internment of individuals solely on the basis of Japanese ancestry; or
 

 (ii) was enrolled on the records of the United States Government during the period beginning on December 7, 1941, and ending on June 30,1946, as being in a prohibited military zone.
 

 (emphasis added).
 

 Under the Act the Attorney General is responsible for identifying, locating, and paying the sum of $20,000 as compensation to each “eligible individual.” 50 U.S.C.App. §§ 1989b-4(a) & (b) (1988 & Supp. V 1993). The Attorney General has promulgated regulations in order to implement the Act’s mandate.
 
 See
 
 28 C.F.R. §§ 74.1-.17 (1994). Through the Office of Redress Administra
 
 *1228
 
 tion, Civil Rights Division, Department of Justice (ORA), the Attorney General notifies individuals of their potential eligibility and verifies their claims upon receipt of certain background information. Where the ORA determines that an individual is ineligible, that person may seek reconsideration from the Assistant Attorney General for Civil Rights.
 

 C.
 
 Facts
 

 The facts in this case are undisputed. Ishida is an American citizen born on November 23, 1942, is of Japanese ancestry, and was alive on August 10, 1988, the date of enactment. Ishida was born after his parents’ “voluntary” relocation or evacuation from California to the State of Ohio between March 2, 1942 and March 29, 1942.
 
 [1]
 
 The ORA deemed both of his parents “eligible” and awarded them compensation under the Act because they had been enrolled on government records as residing in a prohibited military zone.
 
 See
 
 50 U.S.C.App. § 1989b-7(2)(B)(ii) (1988); 28 C.F.R. § 74.3(b)(2) (1994).
 

 In 1992, however, the ORA denied Ishida’s claim for compensation under the Act, concluding that he was not eligible because his “losses were not the result of government action as defined in the Act and the implementing regulations,” despite the fact that Ishida, like his parents, was prohibited by law from returning to the family home in California during the duration of the military restrictions for the West Coast. The Assistant Attorney General for Civil Rights subsequently affirmed the ORA’s denial in a reconsideration decision, stating:
 

 Under the regulations implementing the Act, children that were “born in assembly centers, relocation camps and internment camps” are eligible for redress compensation. 28 C.F.R. 74.3(b)(7); 54 Fed.Reg. 34157, 34160 (August 18, 1989).
 
 However, the regulations “do not include as eligible children bom after their parents had voluntarily relocated from prohibited military zones or from assembly centers, relo
 
 
 *1229
 

 cation camps, or internment camps.
 
 ”
 
 54 Fed.Reg. at 34160.
 
 Therefore, because he was born after his parents relocated from a prohibited military zone, he was not an “individual ... confined, held in custody [or] relocated” ’within the meaning of the Act. 50 U.S.C.App. 1989b-7(2)(B).
 

 (emphasis added). The Assistant Attorney General’s decision did not explain why Ishida was not “otherwise deprived of liberty” under either the Act or the regulations, which do not expressly disqualify such individuals from recovery.
 
 See
 
 28 C.F.R. § 74.3(b) (1994). It merely quotes the DOJ’s policy as set forth in the commentary to its regulations circulated in the Federal Register (policy), that categorically declares ineligible “children born after their parents had voluntarily relocated from prohibited military zones.”
 
 See
 
 54 Fed.Reg. at 34,160.
 

 The trial court held that the DOJ’s determination that the phrase “otherwise deprived of liberty” does not extend to individuals born after their parents voluntarily relocated, and, therefore, to Ishida, is a reasonable interpretation of the Act and is thus in accordance with law, deferring to the DOJ’s interpretation of the Act.
 

 On appeal, Ishida does not challenge the regulations, but the DOJ’s policy interpreting the regulations as excluding children of parents who “voluntarily” relocated and the application of this policy to his case. Specifically, Ishida contends he was “otherwise deprived of liberty,” particularly his right to return to his home, as a result of the statutorily specified laws and orders in effect during the relevant statutory period.
 

 The government does not dispute that Ishida was prohibited by law from returning to the family home during the evacuation, relocation, and internment period. The government even admits that Ishida thus suffered a deprivation of liberty. However, according to the government, Ishida did not suffer a sufficiently direct deprivation of liberty as a result of government action to recover under the Act. The government argues that we must defer to the DOJ’s interpretation of the Act because the DOJ was charged by Congress to determine, case-by-case, which deprivations of liberty were sufficiently direct to warrant redress under the Act.
 

 ANALYSIS
 

 We review questions of statutory and regulatory interpretation
 
 de novo. See Cucuras v. Department of Health and Hum. Servs.,
 
 993 F.2d 1525, 1527 (Fed.Cir.1993). However, an agency’s interpretation of a statute it is entrusted with administering is entitled to deference as long as it is reasonable and does not contravene clearly discernible legislative intent.
 
 Chevron U.S.A. Inc. v. Natural Resources Defense Council,
 
 467 U.S. 837, 842-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984);
 
 DeCosta v. United States,
 
 987 F.2d 1556, 1558 (Fed.Cir.1993). We first ask whether Congress has spoken to the precise question at issue.
 
 Chevron,
 
 467 U.S. at 842-43, 104 S.Ct. at 2781-82. If we determine that the language of the Act is unambiguous and that the intent of Congress is clear, we give effect to the unambiguously expressed intent of Congress.
 
 Id.
 
 If not, the question for the court is whether the agency’s answer is based on a “permissible” construction of the statute.
 
 Id.
 
 at 843, 104 S.Ct. at 2782.
 

 A Statutory Construction
 

 As an initial matter, we observe that the DOJ’s own regulations implementing the Act do not construe the statutory definition of an eligible individual “otherwise deprived of liberty” as narrowly as their interpretational statement in the Federal Register and decision in this case. Under 28 C.F.R. § 74.3, the DOJ deems eligible several categories of individuals who were not “confined, held in custody, [or] relocated.” Additionally, subsection 74.3(c) expressly states that these categories are “not an exhaustive list of individuals who are deemed eligible for compensation.” This section appears to be consistent with the Act.
 

 The DOJ’s policy and decisional interpretation of the Act in this case, by contrast, limit eligibility to children themselves “confined, held in custody, [or] relocated,” and are thus too narrow and contrary to the intent of Congress. We hold that Congress clearly
 
 *1230
 
 intended to include as eligible anyone, including later born children, of Japanese ancestry who has been “deprived of liberty” as a result of the laws and orders which caused them to be excluded from their family’s place of residence in a prohibited military zone. Because we hold that both the DOJ policy and its decision in this case reflect an impermissible construction of the Act — a construction contrary to the intent of the Act — they are ineligible for
 
 Chevron
 
 deference. Because that interpretation is legally incorrect, we reverse the denial of Ishida’s application.
 

 Section 1989b-7(2)(B)(i) states that an eligible individual is one deprived of liberty or property, during the statutory period, “as a result of,”
 
 inter alia,
 
 Executive Order 9066 or 56 Stat. 173, the “Act to provide a penalty for violation of restrictions or orders with respect to persons entering, remaining in, leaving, or committing any act in military zones or areas.” Consequently, we hold the Act entitles to compensation all children who were deprived of liberty because they were excluded from their family homes as a result of Executive Order 9066 and who could not return to their homes without committing a crime under the criminal statute. These individuals suffered a grave deprivation of liberty as a direct result of government action excluding them (and their parents) from their family homes. They suffered economic hardship, ostracism, and familial disruption, along with their parents, as a result of government action.
 

 1. An interpretation of the Act that .excludes those individuals who were not “confined, held in custody, [or] relocated,” or otherwise not explicitly provided for in the statute would render superfluous the phrase “or otherwise deprived of liberty.” The rules of statutory construction require a reading that avoids rendering superfluous any provision of a statute.
 
 See Ratzlaf v. United States,
 
 — U.S. -, -, 114 S.Ct. 655, 659, 126 L.Ed.2d 615 (1994). By including the phrase “or otherwise deprived of liberty” as an independent basis for eligibility, Congress necessarily intended that those individuals of Japanese ancestry who were “deprived of liberty” as a result of the enumerated government actions will be compensated even though they were not “confined, held in custody, [or] relocated.” Thus, the Assistant Attorney General’s reconsideration decision declaring Ishida ineligible because he was not “confined, held in custody, [or] relocated,” without more, would render superfluous and devoid of meaning the alternative basis for recovery,
 
 i.e.,
 
 being “otherwise deprived of liberty.”
 

 Indeed, the DOJ’s regulations
 
 [2]
 
 recognize other classes of eligible individuals, such as members of the Armed Forces of the United States at the time of the evacuation, relocation, and internment period who were prohibited from visiting their families or were forced to submit to restrictions resulting in a loss of liberty,
 
 ie.,
 
 who were “otherwise deprived of liberty or property.” To this end, the Act provides compensation for those who suffered deprivations of liberty, such as exclusion from their domicile, as a result of the government actions specified in the Act.
 
 See
 
 50 U.S.C.App. §§ 1989b-7(2)(B)(i)(I) & (II) (1988).
 
 [3]
 

 2. Basic rules of statutory construction also direct us to read each statutory provision with reference to the whole act.
 
 See Massachusetts v. Morash,
 
 490 U.S. 107, 114-15, 109 S.Ct. 1668, 1672-73, 104 L.Ed.2d 98 (1989). These rules also support our conclusion. The Act speaks in terms of redressing the violations of “basic civil liberties” of citizens and permanent resident aliens of Japanese ancestry who were “excluded” from their places of residence by evacuation, relocation, and internment actions of our government under Executive Order 9066 during World War II. Section 1989a states:
 

 [t]he
 
 excluded
 
 individuals of Japanese ancestry suffered enormous damages, both material and intangible, ... for which appropriate compensation has not been made. For these fundamental violations of
 
 *1231
 
 the
 
 basic civil liberties
 
 and constitutional rights of these individuals of Japanese ancestry, the Congress apologizes on behalf of the Nation.
 

 (emphasis added). To read section 1989b-7(2), the section defining “eligible individual[s],” as not including persons deprived of basic civil liberties because of their exclusion from their homes in California would mean interpreting that section in a manner inconsistent with Congress’ express acknowledgement in section 1989a that “excluded” individuals were deprived of liberty.
 
 See United Sav. Ass’n of Texas v. Timbers of Inwood Forest Assocs.,
 
 484 U.S. 365, 371, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988) (courts should avoid interpreting a provision in a way inconsistent with the policy of another provision).
 

 3. Additionally, nothing in the plain language of the statute indicates that Congress intended to exclude individuals like Ishida. Indeed, the fact that Congress expressly made ineligible those who were deprived of liberty but who relocated to a country with which the United States was at war during the period from December 7, 1941 to September 2, 1945, indicates that Congress could have similarly treated children who suffered a deprivation of liberty but were born to parents who relocated from the restricted areas during the military restrictions.
 
 See
 
 50 U.S.C.App. § 1989b-7(2)(B) (1988). Congress, however, did not so limit the coverage of the Act. Nor did it give any indication of having an intent to so limit the coverage in the legislative history to the Act.
 

 B. The Trial Court’s Opinion
 

 We disagree "with the analysis of the trial court that the Act and the 1992 amendments to the Act precluded a finding of congressional intent to make eligible children of parents who “voluntarily” relocated during the statutory period. The court reasoned, first, that Congress did not include an express provision in the text of the original Act covering children of parents who voluntarily relocated; and second, that in its 1992 amendments to the Act, Congress expressly expanded coverage to include “parents and spouses” but failed to expressly include children. Thus, the court concluded, contrary to Ishida’s contention that the Act applied to all individuals “deprived of liberty” who were of Japanese ancestry, living during the statutory period, and subjected to the United States government policy of discrimination, that “if the Act already applied to such a broad category of people, then there would be no need to specifically expand the Act to include ‘parents.’ ”
 
 Ishida,
 
 31 Fed.Cl. at 287. Not finding legislative history indicating that Congress intended to cover children such as Ishida in the Act, the court deferred to the DOJ’s interpretation that such children were ineligible under the Act.
 

 The trial court, however, incorrectly stated that the amendments extend coverage to parents of Japanese descent. Congress amended section 1989b-7(2) to include as “eligible” “the spouse or a parent of an individual of Japanese ancestry.” Any doubt whether this clause refers to
 
 non-Japanese
 
 spouses and parents is dispelled by the legislative history which states that “the bill would define as eligible those
 
 not of Japanese ancestry
 
 who were spouses or parents of interned Japanese Americans.” House Judiciary Comm., Civil Liberties Act Amendments of 1992, H.R.Rep. No. 863, 102d Cong., 2d Sess. 1, 8 (1992),
 
 reprinted in
 
 1992 U.S.C.C.A.N. 1030, 1037 (emphasis added).
 

 The court is likewise incorrect in assuming that Congress would in the 1992 amendments have rectified any misapplication of the Act with regard to children such as Ishida because, pursuant to the Act and 28 C.F.R. § 74.12, the DOJ has processed claims for compensation in the order of the dates of birth of claimants and by 1992 was only beginning to reach the individuals who had been children during the statutory period. And although the DOJ’s commentary in the Federal Register indicated a policy to deny eligibility to “children born to parents after they had voluntarily relocated” it was not clear at the time that the DOJ would apply this policy to children such as Ishida to whose parents the DOJ gave compensation because it recognized that their evacuation was “voluntary” in name only. Thus, the trial court mistakes the purpose and scope of the 1992 amendments.
 

 
 *1232
 
 Finally, Congress would have had no reason to add an express provision for children such as Ishida if, as consistent with our construction of the Act, it already considered them covered under the “otherwise deprived of liberty” clause of section 1989b-7(2)(B). Thus, the trial court’s reasoning that Congress’ amendment of the Act in 1992 indicates an intent not to extend eligibility to children like Ishida is mere bootstrapping.
 

 C. Arguments on Appeal
 

 The government argues that the language “otherwise deprived of liberty” is ambiguous because it could be construed to mean
 
 any
 
 deprivation of liberty, so that any individual who otherwise qualified by being a citizen or permanent resident alien of Japanese ancestry during the statutory period and who was still alive in 1988 could recover — even if their claim was merely that, although domiciled elsewhere, they could not freely travel to California. As support for the “reasonableness” of the DOJ’s “line drawing” limiting coverage under the Act, the government cites Senator Glenn’s floor statement that “compensation should only be paid to those most directly affected by internment.” Although we refrain from deciding the government’s hypothetical case, we note that exclusion from one’s home is a greater liberty deprivation than mere restraint on travel. We further note that Senator Glenn’s comment is inapposite because Senator Glenn was not discussing eligibility, but rather was explaining the limit upon which heirs would receive an “eligible” but deceased person’s compensation. By including children, spouses ¿nd parents in this category of heirs, Senator Glenn’s statement could only be interpreted as support for our conclusion that such children
 
 were
 
 “directly affected.”
 

 However, neither the Act, the regulations, nor the legislative history includes “directly affected” in the test for eligibility. We conclude that the Commission and Congress clearly intended that all individuals deprived of liberty by being excluded from their homes as a result of the enumerated government actions be eligible. That such individuals were not also subject to other direct government actions such as internment is irrelevant because liberty deprivation, as we note above, is an
 
 alternative
 
 or additional ground for compensation.
 

 We also find unpersuasive the government’s implied argument that children born in internment camps were deemed eligible because they were doubly deprived of liberty as they were both excluded from their homes and confined in camps. Nothing in the Act or its legislative history states or even suggests that eligibility is limited to individuals who can show more than one type of deprivation of liberty as a result of the enumerated government actions. Indeed, requiring more than one liberty deprivation is inconsistent with the operative language of the Act which merely requires that an individual who was not confined meets the alternative standard of having been “otherwise deprived of liberty.” In this case, the exclusion from one’s original place of residence, or home, is the relevant deprivation of liberty.
 

 The government also argues that Ishida was not excluded from his “home” because the Act covers only exclusion
 
 [4]
 
 from one’s “residence” rather than from one’s “domicile.” The government thus makes a distinction between “domicile” which requires an intent to change, and “residence” which is merely the place where one presently resides. Thus, as the government concedes, Ishida’s parents retained their California domicile when they left as a result of Executive Order 9066 because they were compelled by the threat of government action to change their residence, and Ishida attained his parents’ domicile upon birth because a child’s domicile is that of his or her parents,
 
 see Mississippi Band of Choctaw Indians v. Holyfield,
 
 490 U.S. 30, 48, 109 S.Ct. 1597, 1608, 104 L.Ed.2d 29 (1989) (where minors are legally incapable of forming the requisite intent to establish a domicile, their domicile is determined by that of their parents). However, the government maintains that because Ishida was born and actually resided in Ohio,
 
 *1233
 
 Ishida was not excluded from his “residence,” and is therefore ineligible under the Act.
 

 We disagree with the government that the Act is limited to those excluded from their present “residence.” Coverage of individuals such as Ishida who were deprived of basic civil liberties because they were excluded from their family homes during the statutory period as a result of the specified government actions is explicit in the recommendations of the Commission on Wartime Relocation, upon which Congress based the Act. From the Commission’s express language, exclusion from one’s “place of residence pursuant to Executive Order 9066” is a harm the Commission and Congress particularly meant to redress with the Act, recommending:
 

 that Congress establish a fund which will provide personal redress
 
 to those who were
 
 excluded____ This fund should be used, first, to provide a one-time per capita compensatory payment of $20,000 to each of the approximately 60,000 surviving persons
 
 excluded from their places of residence pursuant to Executive Order 9066.
 

 (emphasis added) Personal Justice Denied at 57. Thus, the specific reference to being “excluded” is specifically tied to the “place of' residence” affected by Executive Order 9066 — in this ease, the original place of residence or family home.
 

 Moreover, the Act itself uses neither the term “residence” nor “domicile,” but “prohibited military zone.” Reading the term “prohibited military zone” in conjunction with the wording of section 1989a(a) of the Act which refers to “excluded individuals,” we conclude that the express reference to “place of residence” in the Commission’s report must refer to place of residence within a prohibited military zone — or in this context, to original place of residence or original family home, a concept closer to the legal definition of domicile.
 

 Additionally, the DOJ itself uses the term domicile in 28 C.F.R. § 74.3(b)(4) in reference to the eligibility of members of armed forces who lost property where they were domiciled as a result of the enumerated government actions, indicating that its interpretation of the term “residence” in the Commission’s report is narrower on appeal than in the regulations it promulgated. Thus, we are unpersuaded by the DOJ’s narrow reading of “place of residence” as mere residence, and conclude that contrary to the DOJ’s assertions, Congress intended a concept closer to the legal term “domicile.”
 

 Therefore, although we refrain from reading the full legal import of the term “domicile” into the Act, we use the term “home” or “family home” or original place of residence (place of residence) in the sense of the legal concept of “domicile” because we conclude that the Commission and Congress intended to cover those excluded from their “home” or “original place of residence” in a prohibited military zone. Contrary to the arguments posed by the government, considering the Commission’s express intent to compensate individuals “excluded from their places of residence” the phrase “otherwise deprived of liberty” cannot reasonably be construed to deny compensation to individuals such as Ishida who were indeed excluded from their homes in the prohibited military zones directly as a result of the government’s actions. To conclude that an infant’s “home” is other than his parents’ home would depart from congressional intent, conflict with state family law on determining a child’s domicile, and effect an absurd result.
 

 Finally, the government argues that Congress intended to limit coverage under the Act because it appropriated funds for only 60,000 eligible persons. As support the government again cites a portion of Senator Glenn’s statement “that compensation should only be paid to those most directly affected by internment.” 134 Cong.Rec. 19,118 (1988) (statement of Sen. Glenn). The government then makes the further leap of logic that Congress consequently intended to exclude children born post-relocation because they were not “most directly affected.” We find this argument unpersuasive. The government quotes Senator Glenn out of context and misrepresents the meaning of his statement. In the next sentence Senator Glenn states: “The compromise bill therefore limits the
 
 heirs
 
 who could claim under the vested rights to those most directly affected by the Government action — the spouse, children, and parents.”
 
 Id.
 
 (emphasis added). Sena
 
 *1234
 
 tor Glenn was distinguishing compensation for the living and the dead, discussing the scope of compensation to heirs of those who, although alive and eligible on the 1988 date of enactment, died before they were able to collect the compensation to which they were entitled. The statement — the entire discussion — had nothing to do with defining eligibility for those living on the date of the enactment. Congress’ limitation was that the 60,000 affected individuals still living on the date of enactment in 1988 would be eligible, but that the approximately 60,000 otherwise eligible persons who had died prior to enactment would not.
 
 Id.
 
 Nothing in the Act itself, the legislative history, or the Commission report purports to exclude children like Ishida from the class of eligible persons, or even allows us to make such an inference.
 

 Congress further dispelled any doubt as to whether the original appropriated funding levels reflected an intention to limit eligibility when it passed the 1992 amendments to the Civil Liberties Act which authorized an additional $400 million to permit an increased number of payments under the Act.
 
 See
 
 50 U.S.C.App. § 1989b-3(e) (Supp. V 1993). The Committee report noted that the original sum “proved insufficient to compensate all of the individuals who are eligible under the program.” H.R.Rep. No. 863 at 2,
 
 reprinted in
 
 1992 U.S.C.C.A.N. at 1030-31. In the legislative history to the amendments, Congress explicitly acknowledged that ORA discovered more eligible recipients than Congress originally estimated were alive at the time of the enactment of the Act.
 
 Id.
 
 at 4. Moreover, in the amendments, Congress reiterated the ORA’s duty to seek out individuals who were “evacuated, relocated, interned, or
 
 otherwise deprived of liberty.
 
 ”
 
 Id.
 
 at 3, 1992 U.S.C.C.A.N. at 1031 (emphasis added). We therefore conclude that the government’s argument that funding levels implicitly limit eligibility is contrary to the clear legislative intent of Congress to fund the Act to compensate all eligible individuals, specifically including those “otherwise deprived of liberty.”
 

 CONCLUSION
 

 We conclude that Ishida has satisfied all conditions of eligibility set forth in the Act as properly interpreted. He is an individual of Japanese ancestry and was living on the date of the enactment of the Act. During the evacuation, relocation, and internment period he was a United States citizen and was, by being excluded from his family home, deprived of liberty as a result of the specified laws and orders. Therefore, we conclude that Ishida is entitled to compensation under the Act. The DOJ policy barring his eligibility is invalid as contrary to the Act, although the regulations as written are consistent with the Act and thus are unaffected by this decision. The decision of the Court of Federal Claims upholding as a matter of law the DOJ’s denial of compensation to Ishida is therefore
 

 REVERSED.
 

 [1]
 

 . Ishida’s parents were among those "enrolled on the records of the United States Government ... as being in a prohibited military zone.” 50 U.S.C.App. § 1989b-7(2)(B)(ii). In explaining its extension of compensation under the Act to such individuals, the DOJ in the supplemental commentary to the regulations expressly relies on the Commission’s report and acknowledges that the United States government deemed these individuals "voluntary” evacuees when they, in fact, did not voluntarily leave their homes:
 

 Another group of persons involuntarily evacuated who are deemed eligible under the regulations consist of those who left their places of residence on the West Coast between March 2, 1942, the issuance of Public Proclamation No. 1, and March 29, 1942, the date on which the Public Proclamation No. 4 took effect whereby persons of Japanese ancestry were prohibited from leaving parts of the West Coast area because the Government was preparing to forcibly relocate them later.... [T]he Act defines as eligible one who "was enrolled on the records of the United States Government during the period beginning on December 7, 1941, and ending on June 30, 1946, as being in a prohibited military zone.” The Conference Report explains this language as a reference to some 4,889 Japanese Americans who left the West Coast during the so-called "voluntary” phase of the Government’s evacuation program; and who filed "Change of Residence" cards with the Wartime Civil Control Administration: "The conferees intend to include individuals who filed Change of Residence cards during the period between the issuance of Public Proclamation No. 1, on March 2, 1942 and Public Proclamation No. 4 on March [29] (sic), 1942 as being 'enrolled on the records of the U.S. Government.’ ”
 

 54 Fed.Reg. at 34,159-60.
 

 The Amici argue that children of parents who “voluntarily” relocated during the March 2 to March 29, 1942 interval were not covered under the DOJ Federal Register commentary deeming "children of
 
 voluntary
 
 evacuees” ineligible, whereas Ishida’s parents (and other similarly situated individuals) actually relocated under the threat of government action and pursuant to government laws and restrictions. However, because the DOJ discusses the term “voluntary” in its commentary to the regulations and because it states its statutory interpretation to exclude these children explicitly in the commentary to the regulations,
 
 see
 
 54 Fed.Reg. at 34,160, we conclude that the DOJ used the term "voluntary” for evacuees who left during the March period consistently. We therefore proceed with our analysis treating the DOJ’s decision letter to Ishida citing the Federal Register commentary as derivative of an interpretative decision to deem all such children of "voluntary” evacuees ineligible. And because in its decision to deem "voluntary” evacuees eligible, the DOJ adopts the Commission’s view that these individuals did not in fact voluntarily relocate, we use the term “voluntary” in quotations.
 

 [2]
 

 .
 
 See
 
 28 C.F.R. §§ 74.3(b)(4) & (5).
 

 [3]
 

 . The DOJ’s policy denying compensation to individuals like Ishida who were deprived of basic civil liberties as a result of government action is even more unreasonable when one considers that the Act compensates mere property loss.
 
 See
 
 50 U.S.C.App. § 1989b-7(2)(B) (1988).
 

 [4]
 

 . Section 1989a of the Act refers to "[t]he excluded individuals of Japanese ancestry."
 
 See
 
 50 U.S.C.App. § 1989a(a).