**Toshiko ODOW, a.k.a. Toshi Odow, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 00–284C.**

United States Court of Federal Claims.

Dec. 4, 2001.

David F. Dowd, Washington, D.C., for Plaintiff.

Steven J. Abelson, with whom were Acting Assistant Attorney General Stuart E. Schiffer, David M. Cohen, and Donald E. Kinner, Washington, D.C., for Defendant.

## OPINION

WILSON, Judge.

This case is before the Court on defendant's motion to dismiss for failure to state a claim and on cross-motions for judgment on the administrative record. The major issue presented is whether government-imposed curfews and travel restrictions applicable to Japanese Americans during World War II deprived the plaintiff of liberty within the meaning of the Civil Liberties Act of 1988(CLA), 50 U.S.C. app. §§ 1989–1989d (1994). For the reasons discussed below, the plaintiff's motion for judgment on the administrative record is granted, and the government's motion to dismiss or for judgment on the administrative record is denied.

## BACKGROUND

*Facts*

Unless otherwise noted, the following facts, culled from the administrative record, are not in dispute. Plaintiff Toshiko Odow, an American citizen of Japanese ancestry, was born in Wyoming on May 7, 1921. She was raised by her parents in Rexburg, Idaho, where her father worked as a Section Foreman for the Union Pacific Railroad Company. Odow graduated from Madison High School in Rexburg, Idaho in 1939. Approximately one year later, in the latter part of 1940, Odow was sent by her parents to Salt Lake City, Utah to work as a live-in domestic for a Utah State Senator and his family. Odow's wages were used to supplement the family income; she sent six of the seven dollars she earned each week to her family in Rexburg. Although Odow was living in Utah, she considered her domicile, or permanent home, to be in Rexburg, Idaho. She made frequent visits to Rexburg during the time she resided in Salt Lake City and left most of her personal belongings at her Rexburg home. (Administrative Record (AR) at 162.)

Sometime during the spring of 1941 Odow was hospitalized for appendicitis and returned home to Rexburg for four to six months to recuperate. Following her recuperation, she returned to Salt Lake City and obtained a job as a live-in child care worker for a different family. The exact date of her return to Salt Lake City is unclear from the record. *Compare* AR at 142, 149, 162, 163. With her employer's help, Odow also enrolled in business college, where she studied advanced shorthand, typing, bookkeeping, business machines, and English. After graduating from the business college in spring 1942, she worked as a secretary for the business college's president, eventually earning a salary of $45.00 a month, which, according to Odow, was a "top beginning salary" at the time. (AR at 149, 163.)

In February 1942, two months after the Japanese bombed Pearl Harbor and at the height of wartime anxiety about potential Japanese–American espionage and sabotage, Odow's father was terminated from his position at the railroad after working there for over thirty-five years. The Odow family was consequently evicted from its company-owned residence and temporarily resettled in a dilapidated farmhouse occupied by two other families. (AR at 112–15.) Soon after the government began to forcibly evacuate, intern, and otherwise constrain the movement of Japanese Americans in the Western United States through curfews and travel restrictions, Odow's parents and siblings left Rexburg, Idaho to join her in Salt Lake City, Utah. (AR at 162.)

*Wartime Restrictions*

The curfew and travel restrictions in effect in Idaho were part of a series of legal constraints authorized by President Roosevelt and imposed on Japanese Americans during World War II. *See generally* Greg Robinson, *By Order of the President: FDR and the Internment of Japanese Americans* (2001). On February 18, 1942, President Roosevelt issued Executive Order No. 9066, directing the Secretary of War to identify military areas from which any or all persons could be excluded, and the right of any person to enter, remain in, or leave could be restricted whenever such action was deemed militarily necessary. On February 20, 1942, Secretary of War Stimson delegated authority to implement the Executive Order within the Western Defense Command and instructed the commanders to exclude Japanese–American citizens and Japanese and German aliens from designated military areas. *Personal Justice Denied: Report of the Commission on Wartime Relocation and Internment of Civilians* 100 (1983). The Western Defense Command included the states of Washington, Oregon, California, Arizona, Montana, Idaho, Nevada, and Utah.

Under the authority of Executive Order No. 9066, the military commander of the Western Defense Command issued a series of Public Proclamations creating military areas, military zones, prohibited zones and civilian exclusion orders. Public Proclamation No. 1, issued on March 2, 1942, created two military areas. Military Area No. 1 was comprised of the western half of Washington, Oregon, and California and the southern half of Arizona. Military Area No. 2 was com-

prised of all portions of those states not included in Military Area No. 1. The proclamation also delineated a number of military zones and declared that the designation of Military Area No. 2 did not contemplate restrictions or prohibitions except with respect to the designated zones. *Id.* at 100–01.

Public Proclamation No. 2, issued on March 16, 1942, declared many railroad facilities in California, Oregon, Washington, Idaho, Nevada, Utah, and Arizona to be military zones. Pursuant to this proclamation, the entire state of Idaho was designated Military Area No. 3, and certain zones within each state were created from which Japanese Americans were to be excluded. Hundreds of railroad bridges, tunnels, and railroad buildings and facilities were included in the military zones created by Public Proclamation No. 2, including the railroad facility in Rexburg, Idaho where the Odow family originally resided. (AR at 171–72, 174.) [1]

The Western Defense Command was the only Defense Command to issue travel and curfew restrictions pursuant to Executive Order No. 9066. On March 24, 1942, the Command issued Public Proclamation No. 3, which established curfews and restricted individuals of Japanese ancestry to travel within a five mile radius of their homes unless they obtained special authorization to travel beyond that radius. The curfews were in effect from 8:00 p.m. to 6:00 a.m. and applied to all persons of Japanese ancestry living in and around the zones designated as military areas and military zones by Public Proclamation Nos. 1 and 2. Pursuant to the same statute that criminalized resistance to internment and evacuation, any per-

son who violated the travel or curfew restrictions was subject to immediate exclusion from the specified military areas or zones and to criminal penalties. 18 U.S.C. § 97a (Supp. II 1942) (repealed).

*Statutory and Regulatory Background*

Congress passed the Civil Liberties Act of 1988 to acknowledge and apologize for the "fundamental injustice of the evacuation, relocation, and internment" of Japanese Americans during World War II. 50 U.S.C. app. § 1989(1). The Act authorizes restitution payment in the amount of $20,000 to eligible individuals in full satisfaction of all claims against the United States arising from wartime injustices. *Id.* § 1989b–4(a)(1), (5). A United States citizen or permanent resident alien of Japanese ancestry living on the date of the Act's passage is eligible if, during the evacuation, relocation, and internment period, he or she "was confined, held in custody, relocated, or *otherwise deprived of liberty or property*" as a result of government laws and orders. *Id.* § 1989b–7(2) (emphasis added).

Neither the Civil Liberties Act nor its implementing regulations contain a precise definition of what constitutes a compensable deprivation of liberty or property other than evacuation, relocation, or internment. The regulations promulgated by the Office of Redress Administration (ORA) identify eight categories of individuals who are deemed to have been "otherwise deprived of liberty." 28 C.F.R. § 74.3(b) (2000). The categories include "[i]ndividuals who were members of the Armed Forces of the United States at the time of the evacuation and internment period and were prohibited by government regulations from visiting their interned fami-

---

1. During oral argument, government counsel suggested that despite an earlier finding to the contrary, there was some doubt about whether curfew or travel restrictions were ever in place in Rexburg. (Transcript of October 9, 2001 hearing (Tr.) at 43–50.) In reviewing a decision by the Office of Redress Administration (ORA) on the administrative record, the Court of Federal Claims does not act as a fact finder, and cannot reverse the fact finding of the ORA unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 50 U.S.C. app. § 1989b–4(h)(1). The government may not challenge in the context of litigation the agency's own factual findings in an attempt to justify its decision denying Odow restitution.

The ORA concluded that the restrictions applied, and the Court has not been presented with any evidence that casts doubt on that interpretation. Assuming *arguendo* that there was countervailing evidence below, where there are two permissible views of the evidence, the agency's choice between them cannot be arbitrary and capricious. *Kaneko v. United States*, 122 F.3d 1048 (Fed.Cir. 1997) (citing *Anderson v. City of Bessemer City, N. Carolina*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). If the evidence were in equipoise, the statute requires that the claimant be given the benefit of the doubt regarding issues determinative of eligibility. 50 U.S.C. app. § 1989b–4(a)(3).

lies or forced to submit to undue restrictions amounting to a deprivation of liberty prior to visiting their families." *Id.* § 74.3(b)(5). The regulation expressly provides that it does "not [contain] an exhaustive list of individuals who are deemed eligible for compensation; there may be other individuals determined to be eligible under the Act on a case-by-case basis by the Redress Administrator." *Id.* § 74.3(c). Following the Federal Circuit's decision in *Ishida v. United States,* 59 F.3d 1224 (Fed.Cir.1995), the ORA amended the regulations to extend eligibility to individuals born after the restrictions were lifted by the government to parents who had been evacuated, relocated, or interned from their original place of residence in the prohibited military zones on the West Coast and to individuals who were excluded by Executive Order No. 9066 or military proclamations from their parent's or parents' original place of residence in the prohibited military zones on the West Coast. 28 C.F.R. § 74.3(b)(9) (1997); *see also Ishida,* 59 F.3d at 1229–30.

Congress delegated to the Attorney General the duties of locating and notifying individuals of their potential eligibility, reviewing claims, and making payments to eligible individuals, subject to the availability of funds appropriated to the Civil Liberties Public Education Fund for the purpose of restitution. 50 U.S.C. app. § 1989b–4(a). Congress amended the Act in 1992 to require the Attorney General to give claimants the benefit of the doubt when "there is an approximate balance of positive and negative evidence regarding the merits of an issue material to the determination of eligibility." *Id.* § 1989b–4(a)(3). The amended Act also granted claimants the right to seek judicial review of a denial of compensation exclusively in the Court of Federal Claims, which reviews such denials on the administrative record and sets aside denials if found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. *Id.* § 1989b–4(h)(1).

*Administrative History*

According to the government, "hundreds of members of the families of railroad and mining workers who were required to move from railroad housing because of government re-

strictions and curfews" imposed by Proclamation Nos. 2 and 3, including Odow's siblings, filed claims for restitution under the CLA. (AR at 175.) The vast majority of claimants resided in company-owned housing located within the defined military areas in the Western Defense Command. Concluding that "the Odow family's proximity to the railroad tracks and railroad facilities in Rexburg were such that they were subjected to travel and curfew restrictions," and that the "relocations which related to such government-imposed restrictions were deprivations of liberty redressable under the Act," the government awarded compensation to Odow's three minor siblings in the spring of 1998. (AR at 175.) The government deemed eligible Odow's older brother, Terno Odow, who served in the military during the war, under 28 C.F.R. § 74.3(b)(5) on the basis of "constructive evacuation" from his home and lost property. (AR at 171, 174.)

Odow's initial application for compensation, filed in 1989, was treated by the government as derivative of her father's termination by the railroad. The ORA denied her application in October 1990 on the ground that railroad terminations, although widespread against Japanese Americans during World War II, "[were] not losses as defined in the Civil Liberties Act of 1988 and C.F.R. Part 74(3)(a)(4)," because they were not caused by government action. *See Kaneko v. United States,* 122 F.3d 1048 (Fed.Cir.1997) (terminated railroad employee was not eligible under the Act due to lack of government action).

Odow resubmitted her application in 1997. In response, the ORA solicited information from Odow aimed in part at determining whether Idaho or Utah was her domicile, or permanent home. For example, the government asked her to provide a detailed statement regarding her employment, addresses, and length of residence during the period of 1940–1942; to describe her future plans with regard to living and working in Salt Lake City, Utah versus Rexburg, Idaho when she moved to Salt Lake City in 1940–1941 to work as a domestic; to explain the reasons and length of stay of any returns to Rexburg, Idaho between 1940 and February 1942; and

to describe any financial support she may have given to or received from her parents. (AR at 147.) The government's written requests for information, as well as two telephone interviews of Odow during the summer of 1998, yielded the facts described above. (AR at 142, 149–52, 162, 163.) Odow stated that she was unsure about her future plans in Salt Lake City, and "considered herself [to be] a resident of Idaho and domiciled at her family residence [in Rexburg, Idaho]." (AR at 162.)

An ORA staff member recommended in March 1998 that Odow was eligible for redress. Following additional clarification of her residence and domicile by the ORA, a legal reviewer appears to have crossed out the check mark next to "eligible" on the claimant data sheet, and checked ineligible in October 1998. (AR at 164.) An October 23, 1998 letter from the Administrator of the ORA informed Odow that her application had been "reconsidered under the new standard for family members of railroad employees who were dismissed based on their ancestry." The letter further explained that she was ineligible for redress, based on the government's determination that "[she was] living in Salt Lake City working as a domestic, and attending school at the time of [her] father's dismissal. Thus, [she was] residing away from home and independent." (AR at 165–66.)

Odow appealed the ORA's denial of her claim to the Department of Justice's Civil Rights Division. The appellate decision characterized "the core of [her] claim" as an "injur[y] when the United States wrongfully caused [her] father to be fired from his job at the railroad." (AR at 198.) Citing no legal precedent, the decision concluded that "as a general rule, persons are not eligible under the Act due to deprivations they suffered as a result of government action taken against another family member .... If [Odow] had been living at home at the time, then [she] would have been eligble [sic] because of the

direct effect the constructive eviction had on [her]. However, whatever the motive, at the time of [her] father's firing, [she was] no longer living at home." *Id.* Finding no government action directed at Odow, the Civil Rights Division affirmed the ORA's denial of compensation. *Id.*

## ANALYSIS

*Motion to Dismiss*

The government asserts two threshold defenses. First, the government argues that Odow fails to state a claim upon which relief can be granted, because there is no money remaining in the original Fund that is not already obligated. Second, the government contends that the Court lacks subject matter jurisdiction over claims for payment pursuant to the Emergency Supplemental Appropriations Act, Pub.L. No. 106–31, 113 Stat. 57 (1999), because it is not a money-mandating statute as applied to Odow.[2] The Court will dismiss a complaint for failure to state a claim under Rule 12(b)(4) only if "it appears beyond doubt that Odow can prove no set of facts in support of [her] claim which would entitle [her] to relief," *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), and makes all reasonable inferences in favor of the nonmoving party. *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed. Cir.1991). The plaintiff bears the burden of establishing the Court's jurisdiction by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir.1988).

The CLA conditions an eligible individual's substantive right to restitution on the availability of funds. 50 U.S.C. app. § 1989b–4(a)(1). The government argues that the $20,000 remaining in the original Fund, which has been obligated to pay another claimant if her claim proves successful, is "unavailable," and therefore, Odow fails to state a claim upon which relief can be granted. The government further argues that the

---

**2.** As originally enacted, the CLA had a ten-year life span. 50 U.S.C. app. §§ 1989b–3(d), 1989b–4(e). In 1999, after the sunset date had passed, Congress passed an Emergency Supplemental Appropriations Act, Pub.L. No. 106–31, § 3021, 113 Stat. 57, 100 (1999), which empowered the

Attorney General to reprogram funds for the purpose of paying restitution to individuals eligible under the Civil Liberties Act of 1988. In September 1999, Attorney General Reno exercised her discretion to make these funds available.

approximately $700,000 remaining in the supplemental appropriations coffer—while available for claims pending before the ORA at the time Congress passed the Supplemental Appropriations Act—is not available to Odow. The Court need not decide the legitimacy of the first argument, because it finds the reasoning of *Murakami v. United States*, 46 Fed.Cl. 653 (2000), persuasive with respect to the availability of funds reprogrammed by the Attorney General pursuant to the Supplemental Appropriations Act.

Section 3021 provides, in pertinent part:

Notwithstanding 50 U.S.C.App.1989b et seq. [the CLA] and in addition to any funds previously appropriated for this purpose, the Attorney General may make available from any funds available to the Department of Justice not more than $4,300,000 for the purpose of paying restitution to individuals: (1) who are eligible for restitution under the Civil Liberties Act of 1988 (citation omitted) and who have filed timely claims for restitution; or (2) who are found eligible under the settlement agreement in the case of *Carmen Mochizuki et al. v. United States* (Case No. 97–294C, United States Court of Federal Claims) and filed timely claims covered by the agreement.

113 Stat. at 100. The government argues that the provision's language is permissive rather than mandatory; it merely authorized the Attorney General, within her discretion, to reprogram appropriated funds already available for other purposes to compensate individuals who meet the CLA's eligibility criteria. While the government is correct that the use of the word "may" rather than "shall" rendered the reprogramming of funds discretionary, the Court agrees with *Mura-*

*kami* that "the discretionary language in § 3021 relates only to the Attorney General's authority to reprogram funds—no discretion is afforded the Attorney General to decide who, among eligible individuals, should receive restitution." 46 Fed.Cl. at 658. Rather, the provision's plain language incorporates the CLA's eligibility standards. In so doing, § 3021 satisfies the same requirements as a money-mandating statute for the related purpose of Tucker Act jurisdiction: it sets forth a specific set of prerequisites for compensation [the CLA's eligibility standards] and establishes a sum certain to be paid ($20,000). *Hoch v. United States*, 33 Fed.Cl. 39, 42–43 (1995). Once the Attorney General exercised the discretion conferred on her to reprogram funds for reparations purposes, § 3021 created a substantive right to compensation enforceable against the United States. *Murakami*, 46 Fed.Cl. at 658 (citations omitted).

The government does not contest that § 1989b–4(h)(1) of the Civil Liberties Act vests the Court of Federal Claims with exclusive jurisdiction to decide CLA restitution claims.[3] (Def.'s Mot. Dismiss at 17.) The main thrust of the government's motion to dismiss is that § 3021 funds are not available to the specific plaintiff in this case. The government claims that the limitation on the amount of money that could be reprogrammed—"no more than $4.3 million"— must be construed to apply only to the *Mochizuki* class plaintiffs and to the 79 outstanding claims before the ORA at the time of the CLA's expiration in February 1999, and not to claims, like Odow's, that had already been denied by the ORA prior to the Act's sunset, even if such claims were later appealed to the Court of Federal Claims. The government relies on the fact that the

---

**3.** The provision states that "a claimant may seek judicial review of a denial of compensation under this section solely in the Unites States Court of [Federal] Claims, which shall review denials upon the administrative record and shall hold unlawful and set aside the denial if it is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." The Court has consistently interpreted this provision, together with the CLA's substantive provisions, to confer jurisdiction to set aside unlawful denials and affirmatively to award compensation. *See, e.g., Murakami*, 46 Fed.Cl. at 656; *Consolo v.*

*United States*, 31 Fed.Cl. 447, 449 (1994). As the Court in *Murakami* noted, § 3021 is also money-mandating for purposes of Tucker Act jurisdiction. 46 Fed.Cl. at 659, n. 10. The Federal Circuit held in *Kanemoto v. Reno*, 41 F.3d 641, 646 (Fed.Cir.1994), that "50 U.S.C.App. § 1989b–4(a)(1) [restitution provision], as properly interpreted in light of 50 U.S.C. app. § 1989b–7(2) [eligibility provision], is a mandate for the payment of money over which the Court of Federal Claims has jurisdiction" pursuant to the Tucker Act, 28 U.S.C. § 1491.

$4.3 million sum corresponds approximately to its potential liability for all of the remaining claims pending before the ORA at the time of the Act's expiration. (Def.'s Mot. Dismiss App. at 2.) If, on the other hand, all of the individuals denied compensation by the ORA during the life span of the Act were entitled to compensation upon successful appeal, the government's potential liability would far exceed $4.3 million.

■ The Court must interpret § 3021 of the Emergency Supplemental Appropriations Act in accordance with well-established methods of discerning congressional intent. Section 3021's incorporation of the CLA's eligibility standards is stated plainly; thus, there is no need to resort to legislative history. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) ("[o]ur inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent."). In any event, the legislative history of the Act does not contradict its plain meaning. The congressional floor statements relied on by the government make clear that the additional funding was for "outstanding claims" and that "adding more money to the fund does not authorize further expansion of the class of eligible persons." 145 Cong. Rec. H1607–02, H1623 (daily ed. March 24, 1999) (statement of Rep. Mink). However, individual floor statements, by themselves, are not accorded substantial weight as evidence of legislative intent. *CPSC v. GTE Sylvania, Inc.*, 447 U.S. 102, 117–18, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980); *Bay View, Inc. v. United States*, 278 F.3d 1259, 1266–68 (Fed.Cir. 2001). Moreover, nothing in the floor statements indicates that Congress intended to substitute the CLA's eligibility standards in appropriating additional funding. To the contrary, the reprogramming request was intended to "fulfill the mandate of the Civil Liberties Act of 1988." 145 Cong. Rec. H1623.

■ Odow's claim was "outstanding" at the time of the appropriation because it was in the process of being appealed. The construction of the statute urged by the government would effectively deprive timely claimants of the right to judicial review expressly provided by the CLA. Courts must give effect, if possible, to every provision of a statute, "rather than emasculating an entire section." *United States v. Menasche*, 348 U.S. 528, 538, 75 S.Ct. 513, 99 L.Ed. 615 (1955); *TRW Inc. v. Andrews*, 534 U.S. 19, ——, 122 S.Ct. 441, 449, 151 L.Ed.2d 339 (2001); *Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 249, 105 S.Ct. 2587, 86 L.Ed.2d 168 (1985) ("[T]he elementary canon of construction [is] that a statute should be interpreted so as not to render one part inoperative."). The government effectively argues that restitution *is* available for claims not yet adjudicated by the ORA at the time of the supplemental appropriation *but not* available for claims denied by the ORA prior to the supplemental appropriation and later successfully appealed. Even more illogically, pre-sunset ORA denials later set aside by the Court would not be entitled to compensation, whereas post-sunset ORA denials set aside by the Court would be compensated. Nothing in the statute's language or legislative history suggests that Congress intended such a dubious distinction. To the contrary, § 3021 states by its plain terms that the supplemental funds were to be used to pay restitution to individuals eligible under the Act who filed timely claims, and neither its language nor its legislative history establish any other limitations. Including such claims within the Supplemental Appropriation Act's scope does not expand the class of eligible persons; it merely allows for judicial review of an ORA eligibility determination, as expressly provided for in the Act.

■ Finally, the government asserts that Odow did not identify the curfew and travel restrictions as a basis for eligibility at the agency level and, therefore, is precluded from asserting them as a basis for eligibility before this Court. The CLA does not contain an administrative exhaustion requirement. Rather, it imposes affirmative duties on the government: "the Attorney General shall identify and locate . . . each eligible individual." § 1989b–4(a)(2). The complaint contains a basis for eligibility that was understandably not identified by Odow until she retained counsel in the course of litigation

but should have been more apparent to the government. Because the Court has jurisdiction to review the decision, and Odow has not failed to state a claim upon which relief may be granted, the government's motion to dismiss is denied.

*Cross–Motions for Judgment on the Administrative Record*

 The crux of this case lies in the meaning and limits of the statutory phrase "otherwise deprived of liberty." The government denied Odow's claim on the ground that she was not directly impacted by the curfew and travel restrictions in effect in her native state of Idaho because she had voluntarily relocated to Utah prior to the implementation of wartime restrictions applicable to Japanese Americans in Idaho. The Court of Federal Claims reviews denials of restitution on the administrative record, and sets aside denials that are arbitrary and capricious, an abuse or discretion, or otherwise not in accordance with the law. 50 U.S.C. app. § 1989b–4(h)(1). This Court defers to an agency's interpretation of a statute it administers as long as the agency's interpretation is not arbitrary and capricious and does not contravene clearly discernible legislative intent. *Chevron U.S.A., Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Court holds that the government's decision violates the legislature's intent to compensate Japanese Americans deprived of liberty, as that term must be construed in the context of the Act and its regulations, and has been interpreted by the Federal Circuit's decision in *Ishida.*

 In *Ishida,* the Federal Circuit held that children of Japanese–American parents who evacuated their California homes prior to the implementation of Executive Order No. 9066 are entitled to compensation, because they were "otherwise deprived of liberty" within the meaning of the Act by virtue of their exclusion by law from their parents' "original place of residence." 59 F.3d at 1226. Ishida was born after his parents preemptively relocated from their home in California to Ohio. Neither he nor his parents were forcibly confined, held in custody,

or relocated; rather, they moved in response to the imminent threat of forcible evacuation.

The Federal Circuit reasoned that "Congress clearly intended that all individuals deprived of liberty by being excluded from their homes as a result of the enumerated government actions be eligible." *Ishida,* 59 F.3d at 1232. Noting that the Act "speaks in terms of redressing the violations of 'basic civil liberties' of [individuals] of Japanese ancestry," the Federal Circuit found support for its conclusion in § 1989a of the statute, which states that "excluded individuals" suffered "fundamental violations of basic civil liberties . . . ." *Id.* at 1230–31.

Government-imposed curfews and travel restrictions in effect in Idaho deprived Odow of unrestricted travel to and from her domicile, or permanent home. During the period that the restrictions were in effect, Odow faced a Hobson's choice between completely abandoning her family home or subjecting herself to criminally enforceable curfew and travel restrictions if and when she wished to return, either temporarily or permanently. If Odow had attempted to travel home to Rexburg after 8:00 p.m., she could have been arrested and jailed. If she returned to her family home on a permanent basis, the restrictions that limited Japanese persons to traveling between their homes and places of employment would have significantly restricted her movement to her home and place of work during daytime hours and would have effectively confined her to her home at night.

The government argues that *Ishida* is distinguishable because federal law *barred* Ishida from returning to his family home, whereas federal curfews and travel restrictions "merely" prevented Odow from returning to her home between 8:00 p.m. and 6:00 a.m. and from traveling more than five miles away from her Rexburg home when she returned. Odow's counsel concedes that such restrictions did not rise to the level of liberty deprivation experienced by Japanese Americans who were interned in camps or affected on a daily basis by the curfew and travel restrictions but asserts that Odow is still eligible. (Tr. at 85.)

The statute does not establish a hierarchy of deprivation. To the contrary, the CLA explicitly includes within the scope of eligibility individuals who were "otherwise deprived of liberty or property" and entitles all eligible individuals, regardless of the grounds for their eligibility, to the same payment of $20,000. Freedom to travel is a basic civil liberty. Indeed, the right to travel from one state to another is considered a fundamental personal right firmly embedded in federal constitutional jurisprudence. *See Saenz v. Roe*, 526 U.S. 489, 498, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999) (citing *United States v. Guest*, 383 U.S. 745, 757, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966)). The Supreme Court has "long recognized that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement." *Id.* at 499, 119 S.Ct. 1518 (quoting *Shapiro v. Thompson*, 394 U.S. 618, 629, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969)).[4] Because Congress intended that all individuals deprived of basic civil liberties be eligible for compensation, the ORA's denial of Odow's claim contradicts the language and intent of the Act.

The nature of the deprivation at issue was recognized by the Federal Circuit in *Ishida* and by the ORA regulation identifying categories of eligible individuals. In contrasting the status of Japanese Americans who voluntarily evacuated prior to March 1942 and those forcibly relocated to internment camps, the Federal Circuit noted that voluntary evacuees "*did not have unconditionally free movement into the interior,* but were required to register their anticipated destinations [with the government]." *Ishida*, 59 F.3d at 1227 (emphasis added). Pursuant to

28 C.F.R. § 74.3(b)(5), the condition of being "forced to submit to undue restrictions amounting to a deprivation of liberty prior to visiting their families" provides sufficient grounds under the Act for compensation of Japanese–American members of the military. The Court sees no reason why the same restrictions imposed on a Japanese–American woman temporarily performing domestic service away from her permanent home in order to help support her family is any less entitled to restitution. The distinction between Odow and her brother is purely one of military status; both would have experienced the same restrictions when they returned to visit their permanent family home, or domicile.

The government's distinction between Odow and her sisters, who were "directly" impacted by the curfews and travel restrictions while they lived in Rexburg, ignores the implication of *Ishida*, which held that children who were deprived of access to their family home by their parent's "voluntary" relocation nonetheless suffered a cognizable deprivation of liberty. The Federal Circuit noted in *Ishida* that "neither the Act, the regulations, nor the legislative history includes 'directly affected' in the test for eligibility." 59 F.3d at 1232. True, the total exclusion from one's home experienced by the children of "voluntary" evacuees was rooted in a government-imposed *prohibition* against entry; whereas the liberty-deprivation experienced by Odow was rooted in government-imposed restrictions that operated more conditionally. However, the *Ishida* children were born post-evacuation, and by wartime necessity, never knew their "permanent homes," at least until the restriction on entry was lifted. Odow, on the other hand, was subjected to restrictions that deprived her of the freedom to travel to, from, and within the family home in which she was

---

4. The Supreme Court upheld both curfews and internment policies applicable only to Japanese Americans against constitutional discrimination challenges during the war. *See Hirabayashi v. United States*, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943) (sustaining conviction of person of Japanese ancestry for violating military curfew regulations and upholding constitutionality of curfew regulations against Fifth Amendment discrimination challenge); *Korematsu v.*

*United States*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (upholding compulsory exclusion of individuals of Japanese ancestry from West Coast war area against Fifth Amendment discrimination challenge). Although the Court sustained the restrictions against constitutional challenge at the time, deprivation of liberty need not rise to the level of a constitutional violation to be compensable under the CLA.

born and raised, to which she frequently returned, and, at least until after the wartime restrictions were imposed, intended to return permanently.[5]

Curiously, although much of the agency's fact-finding centered on establishing the details of Odow's residence in Idaho and Utah, the memorandum setting forth the reasoning underlying the denial discusses domicile without a single reference to the Federal Circuit's decision in *Ishida*. In *Ishida*, the Federal Circuit "refrained from reading the full legal import of the term 'domicile' into the CLA;" instead, a person's "home" or "family home" or "original place of residence" is the relevant location in determining whether an individual suffered a deprivation of liberty in the form of exclusion from home. 59 F.3d at 1233. The administrative record makes clear that Rexburg was Odow's "home," "family home," "original place of residence," and domicile. The agency concluded that Odow intended to change her domicile from Rexburg to Salt Lake City based on the fact that she was self-supporting. However, the key distinction between "residence" and "domicile" is intent. *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989). Many financially independent persons reside in places where they are not domiciled; many students of higher educational institutions do not reside at home but do not change their domicile when they temporarily relocate to another state. The record establishes that in 1942, Odow did not intend to live in Salt Lake City indefinitely. She considered the family home in Rexburg to be her domicile, and she intended to stay and work there only "a little longer" after she became a domestic.

Sweeping historical events, in the form of a world war and emergency domestic restrictions, intercepted those plans. After losing both their major source of household income from the railroad and their company-owned home, and facing house confinement by night

and restricted travel within five miles of their makeshift residence by day, Odow's parents and siblings understandably chose to relocate to a community that imposed fewer obstacles to economic and physical mobility for Japanese Americans. That Odow had a toehold in Salt Lake City based on her temporary job and residence, and was pursuing education that would enable her to better provide for herself and her family, does not eradicate the loss of free access to and from her permanent home, and the ultimate loss of that home altogether when her family moved. In accordance with the regulatory requirement that the government determine eligibility on a case-by-case basis and the statute's requirement that claimants be given the benefit of the doubt where the evidence supporting and opposing eligibility is in equipoise, the Court holds that the government erred in denying Odow restitution.

## CONCLUSION

For the reasons discussed above, plaintiff's motion for judgment on the administrative record is **GRANTED**, and defendant's cross-motion is **DENIED**. The Attorney General's denial of restitution is set aside as contrary to the law. Judgment shall be entered in favor of plaintiff in the amount of $20,000. Each party shall bear its own costs.

**IT IS SO ORDERED.**

---

5. A ruling in favor of Odow does not imply that every individual of Japanese ancestry who was alive both during the statutory period and on the date that Congress enacted the CLA is eligible for restitution merely because he or she was prevented from traveling to areas where restrictions were in effect. Odow, unlike the hypothetical individual posited in *Ishida*, 59 F.3d at 1232, had a deep and, until the war, long-standing connection to her family home in Idaho. The disruption and loss caused by wartime restrictions were more serious than the deprivation experienced by any Japanese American prevented from freely traveling interstate during the war.