**Robert K. MURAKAMI, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 99–55C.

United States Court of Federal Claims.

May 4, 2000.

John Howard Ota, Alameda, California, for the plaintiff.

Steven J. Abelson, U.S. Department of Justice, Washington, D.C., with whom was Acting Assistant Attorney General David W. Ogden, for the defendant.

## ORDER

ALLEGRA, Judge.

Plaintiff seeks review of the Attorney General's denial of his claim for redress under the Civil Liberties Act of 1988 (the Act), 50 U.S.C. app. § 1989b, *et seq.* (1988 & Supp. V 1993). The Act establishes a comprehensive program for paying restitution to individuals of Japanese ancestry who were interned or otherwise deprived of their liberties during World War II (WWII). *See* 50 U.S.C. App. §§ 1989b–4(a) & (b). Defendant has moved to dismiss this case under RCFC 12(b)(1) and 12(b)(4), arguing, *inter alia,* that it was filed after this court's exclusive jurisdiction over such "Japanese internment" cases had lapsed. Following two oral arguments and after careful consideration of the parties' briefs, the court concludes that it has jurisdiction over plaintiff's complaint and, accordingly, that defendant's motion to dismiss is DENIED.

## I. Background

### A. The Civil Liberties Act

Congress passed the Civil Liberties Act of 1988, Pub.L. No. 100–383, 102 Stat. 903, in recognition of "the fundamental injustice of the evacuation, relocation, and internment of United States citizens and permanent resi-

dent aliens of Japanese ancestry during WWII." 50 U.S.C. app. §§ 1989(1) & (2). The Act provided an official apology for the internment, *see* 50 U.S.C. § 1989a(a), and established a fund (the Fund) to be used, *inter alia,* to pay $20,000 each to individuals found eligible for restitution. *See id.* at §§ 1989b–3, 1989b–4(a)(1).[1] The Attorney General was responsible for identifying and locating eligible individuals, and paying them this restitution. *See id.* at §§ 1989b–4(a) & (b); *Kanemoto v. Reno,* 41 F.3d 641, 642–43 (Fed.Cir.1994) (describing the statutory mechanism). Through the Office of Redress Administration of the Civil Rights Division of the Department of Justice (ORA), the Attorney General notified individuals of their potential eligibility and verified their claims upon receipt of certain background information. *See* 28 C.F.R. §§ 74.1–.17 (1994).[2]

Congress initially authorized and appropriated $1.25 billion for the Fund, *see* § 1989b–3(e) (1988), later raising that figure to $1.65 billion, *see* § 1989b–3(e) (Supp. V 1993). A "sunset" provision in the Act, 50 U.S.C.App. § 1989b–3(d), provided that the Fund would terminate after August 10, 1998, or when the funds therein were exhausted, whichever occurred earlier. This "sunset provision" read in full:

> The Fund shall terminate not later than the earlier of the date on which an amount has been expended from the Fund which is equal to the amount authorized to be appropriated to the Fund ... and any income earned on such amount, or 10 years after the date of the enactment of this Act [Aug. 10, 1988]. If all of the amounts in the Fund have not been expended by the end of that 10-year period, investments of amounts in the Fund shall be .liquidated and receipts thereof deposited in the Fund and all funds remaining in the Fund shall

be deposited in the miscellaneous receipts account in the Treasury.

50 U.S.C. app. § 1989b–3(d). As originally enacted, the duties of the Attorney General were to cease when the Fund terminated under the "sunset provision," *i.e.,* no later than August 10, 1998. *See* 50 U.S.C. app. § 1989b–4(e) (1988). In 1992, however, Congress amended the Act to extend the Attorney General's duties until 180 days after the Fund terminated, *i.e.,* February 7, 1999. *See* 50 U.S.C. app. § 1989b–4(e) (Supp. V 1993) (enacted by Pub.L. No. 102–371, § 5, 106 Stat. 1168).

Subsequent to the "sunset" date of August 10, 1998, Congress passed the 1999 Emergency Supplemental Appropriations Act (the Appropriations Act), Pub.L. 106–31, 113 Stat. 57 (1999). Section 3021 of the Appropriations Act provides, in relevant part:

> Notwithstanding 50 U.S.C.App. § 1989b et seq. and in addition to any funds previously appropriated for this purpose, the Attorney General may make available from any funds available to the Department of Justice not more that $4,300,000 for the purpose of paying restitution to individuals ... who are eligible for restitution under the Civil Liberties Act of 1988 (50 U.S.C.App. § 1989b et seq.) and who have filed timely claims for restitution ....

Following the enactment of this provision, on September 28, 1999, the Attorney General reprogrammed $4,225,000 to the General Legal Activities Account for the payment of further restitution. On March 20, 2000, counsel for the government reported that of this reprogrammed amount, $2,590,000 has been paid out in restitution and $1,635,000 remains.

### B. The Facts

Plaintiff is an American citizen of Japanese ancestry, who was born in Chicago, Illinois

---

1. The term "eligible individual" was defined in 50 U.S.C.App. § 1989b–7(2). Generally, the term included those United States citizens or permanent residents of Japanese ancestry who, due to various enumerated actions taken by the U.S. government, were evacuated, relocated or interned during the period between December 7, 1941 and June 30, 1946.

2. The regulatory framework for administering the Act was promulgated by the Attorney General in 1989. Under these regulations, individuals denied payment by the ORA could appeal that decision to the Assistant Attorney General of the Civil Rights Division; an affirmation of the ORA's decision by the Assistant Attorney General served as a final administrative action with respect to the appeal. *See* 28 C.F.R. §§ 74.15, 74.16.

on August 23, 1945, approximately one year after his parents had left the Manzanar internment camp near Bishop, California. Plaintiff's parents had been forced to move from their home in Los Angeles to Manzanar in 1942.[3] On October 29, 1996, plaintiff filed a claim for redress under the Act, alleging that the U.S. Government's exclusion of his parents from Los Angeles effectively deprived his parents of the opportunity to rear him in their home town. *See Ishida v. United States*, 59 F.3d 1224 (Fed.Cir.1995) (recognizing the potential viability of such a claim under the Act).

On June 23, 1997, the ORA denied plaintiff's claim for compensation, holding that he was ineligible under the statute for reparation payments. According to the ORA, plaintiff was born after the issuance of Proclamation No. 21, which, in its view, effectively lifted any travel restrictions upon citizens of Japanese ancestry as of January 20, 1945, approximately seven months before plaintiff was born. The Civil Rights Division of the Department of Justice affirmed the ORA decision on March 25, 1998.

Following this affirmation, but prior to the sunset of the Act, on August 7, 1998, Milton McConkey, the budget officer for the ORA, obligated all of the funds remaining in the Fund ($8,941,018.00) to avoid having those dollars revert to the miscellaneous receipts account in the Treasury. This action was taken in reliance upon 31 U.S.C. § 1502(b), which, in appropriate circumstances, allows agencies to retain funds that would otherwise revert to the Treasury in anticipation of the payment of judgments and settlements in litigation. As a result of the action taken by Mr. McConkey, on August 10, 1998, all the monies in the Fund remained with the ORA and none reverted to the Treasury.

On February 5, 1999, plaintiff filed a complaint in this court pursuant to 50 U.S.C. app. § 1989b–4(h)(1), appealing the decision of Civil Rights Division affirming the ORA's denial of his requested restitution. Defendant filed a motion to dismiss this complaint on May 17, 1999, arguing that, as of the date plaintiff filed his complaint, there no longer was a Fund from which any redress payments could be paid and, as such, this court lacked jurisdiction. Following the filing of defendant's motion to dismiss, Congress passed the Appropriations Act, described above. On June 23, 1999, this court ordered defendant to file a supplemental brief regarding the impact of the Appropriations Act on the status of plaintiff's claim for reparations, specifically on whether section 3021 served to revive jurisdiction over plaintiff's claim such that defendant's motion to dismiss should be withdrawn. Defendant filed this supplemental brief on August 23, 1999, therein arguing that the provisions of section 3021 of the Appropriations Act regarding the payment of restitution are permissive, and not mandatory, and that the $4.3 million dedicated to further reparation payments under the Act was not intended to benefit those individuals, like plaintiff, whose claims were denied prior to the sunset of the Act and who had failed to file suit in the Court of Federal Claims until after the Fund expired.[4]

## II. Discussion

Defendant's motion raises separate issues concerning this court's jurisdiction and whether this case is currently moot. As discussed below, however, analysis of these issues converges on three sets of provisions: (i) sections of the original Act dealing with the authority of the Attorney General to make restitution and this court's exclusive jurisdiction over Japanese internment cases; (ii) various provisions in Title 31 of the U.S.

---

**3.** Plaintiff's parents were among those "enrolled on the records of the United States Government ... as being in a prohibited military zone." 50 U.S.C.App. § 1989b–7(2)(B)(ii).

**4.** The court conducted two oral arguments in this case primarily because, after the first oral argument, defendant provided the court with a memorandum prepared by the General Counsel of the Justice Management Division that appeared in-

consistent with the legal positions previously taken by defendant. *See generally Land v. Dollar*, 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947) (noting that a court may evaluate affidavits and other relevant evidence submitted by the parties in examining its jurisdiction). At the second oral argument, defendant significantly revised its position in this case, but continued to maintain that this court lacks jurisdiction.

Code that supply basic governmental budget accounting rules potentially applicable here; and (iii) section 3021 of the 1999 Appropriations Act, which may or may not breathe life into this suit. As will be demonstrated below, the route between these provisions is labyrinthine and tortuous (due, in no small part, to defendant's shifting positions in this case), but ultimately leads, in the end, to a conclusion that this court may consider the merits of plaintiff's complaint.

As sovereign, the United States "is immune from suit save as it consents to be sued ... and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941) (citations omitted). Any waiver of sovereign immunity must be unequivocally expressed and may not be implied. *See United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). In its 1992 amendments to the Act, Congress granted this court exclusive jurisdiction to conduct judicial review of the denial of any restitution claims filed after September 27, 1992. *See* 50 U.S.C.App. § 1989b–4(h)(1). This provision provides:

> A claimant may seek judicial review of a denial of compensation under this section solely in the United States Court of Federal Claims, which shall review the denial upon the administrative record and shall hold unlawful and set aside the denial if it is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

*Id.* While obviously operating as grant of jurisdiction, this provision also constitutes a waiver of sovereign immunity because, in conjunction with the remainder of the Act, it "creates [a] substantive right enforceable against the United States." *United States v.*

*Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). *See also Lane v. Pena,* 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996); *United States v. Nordic Village, Inc.,* 503 U.S. 30, 33–34, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992). Consistent with this analysis, section 1989b–4(h)(1) has been construed to authorize this court not only to set aside unlawful denials of claims, but also to award affirmatively compensation under the Act. *See Song v. United States,* 43 Fed.Cl. 621, 645–46 (1999), *appeal dismissed,* 1999 WL 1046463 (Fed.Cir.1999); *Consolo v. United States,* 31 Fed.Cl. 447, 452 (1994), *aff'd,* 65 F.3d 186 (Fed.Cir.1995). *See also Ishida v. United States,* 59 F.3d at 1234 (holding an individual entitled to compensation under the Act). Accordingly, this court may exercise plenary jurisdiction over plaintiff's complaint.[5]

However, defendant argues, under RCFC 12(b)(4), that even if this court has jurisdiction, plaintiff's complaint is moot because there are no appropriated funds from which to pay a judgment. *See generally City of Houston v. Department of Housing and Urban Development,* 24 F.3d 1421, 1424 (D.C.Cir.1994) (dismissing, as moot, portion of action because of lapsed appropriation). Defendant notes that the Judgment Fund is not available to pay a judgment here. It argues further that any dollars retained by the Civil Rights Division under Title 31 of the U.S. Code or subsequently appropriated by the Congress in the 1999 Appropriations Act have been specifically obligated for purposes unrelated to this case and thus are unavailable to make a restitution payment to the plaintiff.[6] For his part, plaintiff contends that, notwithstanding the "sunset" provision of 50 U.S.C.App. § 1989b–3(d), monies from the Fund were retained by the Civil Rights Division and later supplemented by the Con-

---

5. At the second oral argument conducted in this case, defendant admitted that, subject to the availability of funding, suits challenging the denial of restitution claims could be filed any time within six years of the denial. The six-year time frame derives from the statute of limitations applicable to most actions filed in this court. *See* 28 U.S.C. § 2501(a).

6. Defendant originally argued that the Fund created in section 1989b–4(a)(1) lapsed on August

10, 1998, approximately six months before plaintiff filed his complaint, and that, as a result, there is no Fund from which to pay a judgment rendered in this case. At the second oral argument, however, defendant abandoned this argument, asserting that, notwithstanding the language of the Act, sections 1552(a) and 1553(a) of Title 31 of the United States Code, discussed below, authorize the Attorney General to make restitution payments after August 10, 1998.

gress and are available to pay a judgment awarding restitution to the plaintiff.

The language of section 1989b–3(d) is seemingly unambiguous in requiring the Fund to terminate no later than August 10, 1998. Section 1989b–4(g)(1) further provides that "[a]n eligible individual may be paid under this section only from amounts in the Fund." *See also* 50 U.S.C.App. § 1989b–4(g)(2) ("Nothing in this title . . . shall authorize the payment to an eligible individual by the United States Government of any amount authorized by this section from any source other than the Fund"). Notwithstanding this language, defendant initially took the position that the Attorney General's ability to make restitution payments after August 10, 1998, was preserved by 31 U.S.C. § 1502(b) (1994). That section provides:

> A provision of law requiring that the balance of an appropriation or fund be returned to the general fund of the Treasury at the end of a definite period does not affect the status of lawsuits or rights of action involving the right to an amount . payable from the balance.

As previously noted, on August 7, 1998, the ORA, relying on section 1502(b), obligated approximately $8.9 million remaining in the

Fund for the payment of restitution claims, settlements and lawsuits and, subsequent to August 10, 1998, dispersed all but $40,002 of this amount.

At the second oral argument conducted in this case, defendant cited two other provisions, 31 U.S.C. §§ 1552(a) and 1553(a), as the source of the Attorney General's power to make restitution payments after August 10, 1998. Section 1552(a) indicates that accounts remain open for five years "after the period of availability for obligation of a fixed appropriation account ends," and section 1553(a) provides that before the closing of the account the amounts therein "remain available for recording, adjusting, and liquidating obligations properly chargeable to that account." According to defendant, in combination, these provisions preserve the authority of the Attorney General to make restitution payments for at least five years after the formal termination of the Fund under the sunset provision of the Act.

However, defendant claims, for various reasons, that the funds preserved by application of these Title 31 provisions are unavailable for the payment of any judgment owed plaintiff. While the court is highly skeptical of these claims,[7] the debate over whether

7. Straining to draw a distinction between plaintiff and those who actually received restitution following the Fund's termination, defendant asserts, for example, that the funds retained under the cited provisions of Title 31 are not currently available for the payment of a judgment herein because they have been obligated only for administrative appeals and lawsuits that were pending on August 10, 1998. The record, however, does not bear out this contention. To the contrary, the internal memorandum filed by defendant pursuant to court order as the document effectuating the obligation of these funds does not restrict their use to matters pending on August 10, 1998, and instead cites, as an additional reason for retaining the funds, the possibility that new litigation would be filed after the sunset date, include cases involving the "children of internees." Plaintiff's case thus falls within the contours of this obligating document and thus that obligation provides no impediment to the payment of a judgment to plaintiff from the money remaining from the $8.9 million retained by the ORA.

At the second oral argument in this case, defendant's counsel reemphasized that the ORA and the Civil Rights Division had obligated the remaining funds available from the Fund to two other pending cases. Counsel, however, could

not produce any budget document that supported this claim, other than the sworn affidavit of Mr. McConkey—the very same Mr. McConkey who drafted the obligating document discussed above, which manifestly does not do what defendant claims it does. In light of this obligating document, Mr. McConkey's affidavit appears to be inaccurate. At the second oral argument, counsel for defendant also asked the court to "take [his] word" that the limiting obligation exists. Without doubting counsel's good faith, this court is unwilling to hold that jurisdiction does not lie here based on unsupported assertions of counsel regarding the existence of a supposed obligation that is not evidenced in some written form and that is contradicted by the only budget document produced by the defendant. The notion of a jurisdiction-depriving "unrecorded" obligation not only conjures up visions of Alice in Wonderland—*see* Lewis Carroll, Alice in Wonderland 163 (D. Gray ed., 1971) ("When I use a word . . . it means just what I choose it to mean—neither more nor less")—but also runs counter to the dictate of 31 U.S.C. § 1501(a) that obligations be "recorded." *See also* B–114,578, 32 Comp. Gen. 436, 437 (1953) ("In order to determine the status of appropriations, both from the viewpoint of management and the Congress, it is essential

section 1502(b) or sections 1552(a) and 1553(a) preserve the Attorney General's authority to pay restitution as to plaintiff is transcended by the more fundamental question whether these provisions preserve, as to *any* claimants, this payment authority beyond August 10, 1998. While reasonable arguments can be made to that effect, it is not readily clear that the general provisions of Title 31 cited by defendant trump the specific sunset provisions in the Act. *See Fourco Glass Co. v. Transmirra Prods. Corp.,* 353 U.S. 222, 228–29, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957) ("specific terms prevail over the general in the same or another statute which otherwise might be controlling.") This court, however, will refrain from resolving this issue because it believes that section 3021 of the Appropriations Act, in combination with the Act, provides a more certain basis for the payment of any judgment rendered herein and thus avoids any mootness concerns.

As previously noted, this appropriations provision indicated that "notwithstanding 50 U.S.C.App.1989b *et seq.,*" the Attorney General "may" make available from any funds available to the Department of Justice not more that $4,300,000 for the purpose of paying restitution to individuals "who are eligible for restitution under the Civil Liberties Act of 1988 . . . and who have filed timely claims for restitution." This provision thus allows for the payment of restitution "notwithstanding" the sunset provision of the original Act. The Attorney General has, in fact, used her authority under this provision to reprogram $4,225,000 to the Department's General Legal Activities Account, which, *inter alia,* funds the Civil Rights Division.

Seizing on the statute's use of the word "may," defendant argues that section 3021 does not authorize the payment of judgments because it gives the Attorney General discretion to reprogram funds, but does not require her to do so. *See, e.g., Collins v. United States,* 67 F.3d 284, 286 (Fed.Cir.1995); *Eastport S.S. Corp. v. United States,* 178 Ct.Cl. 599, 372 F.2d 1002, 1007–09 (1967). While permissive language, such as the word

that obligations be recorded in the accounting records on a factual and consistent basis

"may," often signals that Congress does not intend to create a substantive right to compensation, the use of such discretionary terminology is not necessarily determinative. *See Confidential Informant v. United States,* 46 Fed.Cl. 1, 5 (2000). Indeed, in the related context of determining whether a statute is "money-mandating" for purposes of Tucker Act jurisdiction, this court has identified two characteristics that indicate that a statute containing discretionary language requires payment. First, the statute must "enumerate specific requirements that must be fulfilled before [a claimant] acquires an absolute right to compensation." *Hoch v. United States,* 33 Fed.Cl. 39, 42 (1995). *See also Tyson v. United States,* 91 Ct.Cl. 139, 32 F.Supp. 135, 136 (1940). Second, the statute must state a sum certain. *See id.* at 44; *Confidential Informant,* 46 Fed.Cl. at 5–6.

Critically, the discretionary language in Section 3021 relates only to the Attorney General's authority to reprogram funds—no discretion is afforded the Attorney General to decide who, among eligible individuals, should receive restitution. Rather, the statutory language requires the Attorney General to make such payments to all individuals eligible under the Act. Since the reprogramming authorized by section 3021 has already occurred, in this court's view, the condition for requiring the payment of restitution has been triggered. In these circumstances, the statute thus defines a specific set of requirements that must be fulfilled in order to obtain compensation, namely the eligibility standards in the original Act. By virtue of its reference to the Act, section 3021 also establishes a sum certain to be paid, namely, $20,000. Accordingly, based upon this language, the court finds that, triggered by the Attorney General's reprogramming of funds, section 3021 establishes a substantive right to compensation and thus constitutes a source of payment for a judgment rendered in this case. *See Selman v. United States,* 204 Ct.Cl. 675, 498 F.2d 1354, 1356 (1974); *Hirschmann v. United States,* 11 Cl.Ct. 338, 341 (1986) ("[w]here law or regulation re-

throughout the Government.")

quires that the government take action, jurisdiction will be found in this court").

Defendant next argues that, even if section 3021 authorizes the payment of restitution, the plaintiff is not among those covered by its provisions. Defendant asserts that plaintiff is not "eligible for restitution under the Civil Liberties Act of 1988" because his claim was denied by the ORA. In support of this assertion, defendant cites legislative history purportedly indicating that the quoted language was only designed to reach those individuals who had filed claims prior to August 10, 1998, that were not resolved by the ORA prior to the termination of the Fund. In determining mootness, however, the issue here is not whether plaintiff is currently entitled to restitution under the Act, but whether the Attorney General would be obliged to pay restitution from the funds she has reprogrammed if this court determines that plaintiff is so eligible. Contrary to defendant's claims, the plain language of section 3021 clearly requires such payments and by incorporating the eligibility standards of the Act (*e.g.*, 50 U.S.C. § 1989b-7(2)), provides a detailed definition of who is eligible for restitution. In these circumstances, defendant's reliance on the legislative history of section 3021 is misplaced. Since the statute defines eligibility for compensation and the requirement for payment in plain language,

there is no need to advert to the statute's sparse legislative history in search of limitations on the statutory definition of who is covered. *See United States v. Gonzales*, 520 U.S. 1, 6, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997) ("Given the straightforward statutory command, there is no reason to resort to legislative history."); *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).[8] Even were this court to look at the legislative history in question, *see Darby v. Secretary of HUD*, 509 U.S. 137, 147, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993), it does not provide the "clear showing of contrary legislative intent" required for this court to depart from or augment the statute's otherwise clear language. *MCI Telecommunications Corp. v. United States*, 878 F.2d 362, 365 (Fed.Cir.1989).[9]

Regarding the other prong of section 3021, even the defendant readily admits that, while neither section 3021 nor the Act defines when a claim is "timely filed," plaintiff's claim, which was filed prior to August 10, 1998, certainly was timely filed. The court agrees. Accordingly, the plain language of section 3021 refutes defendant's claim that plaintiff is not covered by its provisions. As such, section 3021 provides a source of funding from which the Attorney General may

---

**8.** *See also Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981); *Martin J. Simko Constr., Inc. v. United States*, 852 F.2d 540, 542–43 (Fed.Cir.1988); *Sharp v. United States*, 27 Fed.Cl. 52, 59 (1992), *aff'd*, 14 F.3d 583 (Fed.Cir.1993).

**9.** Defendant relies on portions of floor statements that indicate that the reprogrammed funds would be used to pay claimants whose eligibility had not been determined by the ORA as of August 10, 1998. *See* 145 Cong. Rec. S5667–01, S5670 (daily ed. May 20, 1999) (statement of Sen. Stevens); 145 Cong. Rec. H1607–02, H1623 (daily ed. March 24, 1999) (statement of Rep. Mink). But, even if these statements could be viewed as accurately reflecting Congressional intent, they can be read as merely describing, in a noninclusive way, the allowable uses of the funds, rather than engrafting limitations on the language of the statute, as defendant contends. Moreover, other aspects of the sparse legislative history of this provision support the notion that its supporters did not wish to leave any potentially eligible individuals without restitution. Thus, for example, in concluding her floor remarks, Congresswoman Mink stated: "I urge the House to accept the Senate's $4.3 million reprogramming proposal and seize this opportunity to pay our debt to the remaining internees.... Let us close this shameful chapter of our nation's history in an honorable way. Let us fulfill the mandate of the Civil Liberties Act of 1988 and agree to this reprogramming request." 145 Cong. Rec. H1607–02, H1623 (daily ed. March 24, 1999).

Defendant also makes much of the fact that a holding that section 3021 applies to plaintiff would pave the way for approximately 640 other similarly situated individuals to file suit protesting the denial of their restitution claims. It argues that Congress could not have anticipated this result in making available only an additional $4.3 million. The Federal Circuit, however, rejected a similar argument in *Ishida v. United States*, 59 F.3d 1224, 1233–34 (Fed.Cir.1995). In that case, the government similarly argued that the Act did not apply to the children of Japanese ancestry born post-relocation because the Congress only authorized funding to cover 60,000 eligible individuals.

pay a judgment rendered in this case and, for that reason, this matter is not moot.[10]

## III. CONCLUSION

Based on the foregoing, the court concludes that it has jurisdiction to consider plaintiff's complaint and that this matter is not moot. Accordingly, defendant's motion to dismiss is hereby **DENIED**.

---

**10.** The court notes that its analysis of section 3021 also would support this court's exercise of Tucker Act jurisdiction to consider plaintiff's complaint. As required by 28 U.S.C. § 1491, the analysis above reveals that, following the reprogramming, section 3021 operates as a money-mandating statute, thereby meeting the prerequisite for invocation of our Tucker Act jurisdiction.

*See, e.g., United States v. Mitchell,* 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); *Testan,* 424 U.S. at 398, 96 S.Ct. 948. *See also Kanemoto,* 41 F.3d at 646–47 (holding, prior to the passage of 50 U.S.C. § 1989b–4(h)(1), that the Court of Federal Claims had Tucker Act jurisdiction to require the payment of restitution under the original Act).