**Imari Abubakari OBADELE, Kuratibisha X Ali Rashid, and Kalonji Tor Olusegun, Plaintiffs,**

v.

**THE UNITED STATES of America, Defendant.**

No. 99–195C.

United States Court of Federal Claims.

April 24, 2002.

Maynard M. Henry, Sr., Alexandria, VA, for Plaintiffs.

Steven J. Abelson, Washington, DC, with whom were David W. Ogden, David M. Cohen, and Robert E. Kirschman, for Defendant. Tink D. Cooper, of counsel.

*OPINION*

BASKIR, Chief Judge.

Three Plaintiffs—Dr. Imari Abubakari Obadele, Mr. Kuratibisha X Ali Rashid, and Mr. Kalonji Tor Olusegun—seek compensation from the United States in order to redress wrongs they—or, more specifically, their ancestors—suffered as members of the African American race. Plaintiffs assert that the Tucker Act, 28 U.S.C. § 1491(a)(1) (1994), and the Civil Liberties Act of 1988. 50 U.S.C. app. § 1989b–4(h), Pub.L. 100–383 (Aug. 10, 1988), 102 Stat. 903, (the Act, or the CLA), as amended Pub.L. 102–371 (September 27, 1992), 106 Stat. 1167 (West 2001), entitle them to such relief.

Defendant brings a motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(1) and 12(b)(4), respectively. In the alternative. Defendant argues that Rule 56.1 entitles it to judgment upon the administrative record.

Defendant's motion to dismiss is hereby DENIED. Notwithstanding numerous arguments to the contrary, Plaintiffs can sustain an action under the CLA's independent grant of jurisdiction. However, on the record before us we find that Defendant is entitled to judgment as a matter of law. Accordingly, Defendant's motion for judgment upon the administrative record is GRANTED.

### STATUTORY FRAMEWORK

The Civil Liberties Act of 1988 provides a formal apology and benefits, including redress payments of $20,000, to certain individuals affected by the Federal Government's evacuation, relocation, or internment of United States citizens and permanent resident aliens of Japanese ancestry during Word War II. 50 U.S.C. app. § 1989. The statute established within the Justice Department Civil Rights Division the Office of Redress Administration (ORA) to identify individuals eligible for relief in connection with those wrongs associated with the World War II emergency action.

The Attorney General prescribed rules implementing the Act's redress provisions. Those rules clearly define standards of eligibility. Under those rules claimants must demonstrate that:

(1) They are of Japanese ancestry; and

(2) They were living on the date of the Act's enactment, August 10, 1988; and

(3) During the evacuation, relocation, and internment period (December 7, 1941 through June 30, 1946) they were:

United States citizens; or

Permanent resident aliens who were lawfully admitted into the United States; and

(4) They were confined, held in custody, relocated, or otherwise deprived of liberty and property as a result of Executive Order 9066 or other related federal government action respecting the evacuation, relocation, or internment of individuals solely on the basis of Japanese ancestry.

28 C.F.R. § 74.3 (Eligibility Determinations)

The Act was subsequently amended as follows to provide for judicial review exclusively in this Court:

A claimant may seek judicial review of a denial of compensation under this section *solely in the United States Claims Court [United States Court of Federal Claims]*, which shall review the denial upon the administrative record and shall hold unlawful and set aside the denial if it is found to be arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

50 U.S.C. app. § 1989b–4(h)(1) (2001) (emphasis added); Pub.L. 102–371, §§ 4,5,6 (a) (Sept. 27, 1992), 106 Stat. 1167, 1168. This provision has been held to be a specific waiver of sovereign immunity; it authorizes the Court to review denials of compensation and to award payments under the Act. *See Murakami v. United States*, 46 Fed.Cl. 653, 656 (2000). Notwithstanding this explicit statutory grant of jurisdiction, Defendant has challenged the Court's jurisdiction as applied to Plaintiffs' claims.

## BACKGROUND

Except for their allegation that they are descendants of persons who were "confined, held in custody, relocated or otherwise deprived of liberty or property," Plaintiffs Obadele, Rashid, and Olusegun do not fall within any category of individuals explicitly afforded relief under the Act. U.S.C. §§ 1989b–7(1)–(2). This is undisputed. Plaintiffs' claims before the ORA, and now before this Court, are based not upon Japanese ancestry, the internment, or any effects of the war-time emergency action. Instead, Plaintiffs base their claims upon the enslavement of their ancestors and the continuing failure of the United States to recognize African–Americans' right to self-determination following the abolition of slavery. *See* Pl. Resp. to Def. Supp. Br. at 15 ("[D]escendants of persons kidnap[p]ed from Afrika [sic] who have been born in the United States are U.S. citizens without a right to self-determination.")

Dr. Obadele is affiliated with a movement to create an independent "New Afrikan" state in the southern United States. At one point he renounced his citizenship, claiming instead to be a "citizen" of the Republic of New Afrika. As the one-time President of the "Republic of New Afrika," Dr. Obadele has taken up arms against the United States to protect his "capitol" in Mississippi. When, under his leadership, his supporters murdered one law enforcement officer and wounded several others, Dr. Obadele unsuccessfully sought immunity for his actions claiming to be the leader of a sovereign nation. His resulting prosecution and incarceration was seen by him as but another reason he is entitled to restitution. *See* Application for Redress, Dr. Obadele (August 3, 1998); *see generally, United States v. James*, 528 F.2d 999 (5th Cir.1976)(Obadele, a/k/a Richard Bullock Henry, was sentenced to twelve years confinement for his convictions in United States District Court, S.D. Miss., for conspiracy, assault on federal officers and firearms violations.) In this instance, however, he and his fellow Plaintiffs have resorted to lawful means to secure the relief they seek.

The Plaintiffs' case was first presented before the ORA. Dr. Obadele and Mr. Rash-

id filed their claims on August 3, 1998; Mr. Olusegun filed his on August 10, 1998, the date of the Act's sunset provision. There has been no allegation that the claims were untimely. The claimants sought $20,000 in redress payments for themselves and their family members. In apparent recognition of the fact that the statute provided no relief for them as literally read, Plaintiffs also requested that the Director of the ORA "urge the Attorney General to seek Congressional extensions and new appropriations under the Civil Liberties Act of 1988, as appropriate to provide additional funds for all those New Afrikans similarly situated." Application for Redress, Dr. Obadele (August 3, 1998). It is unclear to what extent the Attorney General complied with this request. However, the administrative record does reveal that Congressman Conyers (D–MI), who has repeatedly sponsored African–American reparations legislation, was notified of Dr. Obadele's claim. Administrative Record (AR) at 84–87.

The ORA promptly denied Plaintiffs' claims for failure to meet eligibility criteria. Although the claims apparently failed to establish a number of the requirements detailed above, ORA's denials emphasized the failure to establish the first requirement—Japanese ancestry—describing the requirement as a "threshold legal criterion." Letter of DeDe Greene (November 19, 1998) at AR 3; Letter of Deborah Cooper (August 7, 1998) at AR 15.

On October 13, 1998, Dr. Obadele appealed to the Assistant Attorney General, Civil Rights Division, as instructed by the ORA, asking that he reverse the ORA's ruling as arbitrary, capricious, an abuse of discretion, and contrary to law. *See* 28 C.F.R. §§ 74.15–16 (1989)(Persons determined ineligible may appeal within sixty days to the Assistant Attorney General for the Civil Rights Division). In his appeal, Dr. Obadele again urged the Attorney General to seek Congressional extension or re-enactment of the Civil Liberties Act to reimburse him and those similarly situated "five times $20,000 on the basis of the longer racist suffering of the members of the class, as compared with the suffering of the Japanese, who well de-

served the small amount of money awarded them." Appeal of Denial of Redress Claim, Dr. Obadele (October 13, 1998). In an extensive exchange of correspondence over a total of six months, Dr. Obadele repeated this request several times and provided additional documents that were requested by the Assistant Attorney General's Office during the pendency of his appeal.

Finally, on February 5, 1999, the ORA notified plaintiffs that not only were their claims denied (this time on the basis of a number of reasons, not just for failure to establish Japanese ancestry), but also that the redress program expired on that very date. Nonetheless, the letter went on to explain that Plaintiffs had sixty days upon receipt of the letter to file an appeal. AR 89–91.

The agency also reiterated the basis for its earlier denial of Dr. Obadele's claim, resting on the fact that the plaintiffs were admittedly not of Japanese ancestry:

> One of the threshold criteria of the Act requires that *an individual be of Japanese ancestry,* or the spouse or parent of an individual of Japanese ancestry.
>
> \* \* \* \* \* \*
>
> In support of your claim, you submitted a declaration under oath as well as several written statements and supporting documentation indicating you are of "Afrikan" ancestry. Based on a review of your file, *you have clearly indicated that you are not of Japanese ancestry* ... Nor have you claimed or submitted proof that you were the spouse or parent of an individual of Japanese ancestry and were evacuated, relocated or interned with your spouse or parent as a result of specific Federal government action as set forth in the Act. You have claimed various types of deprivations; however, none of your losses were as a result of Executive Order 9066 or any other related Federal government action. Thus, any deprivations sustained by you are not losses covered by the Act because your losses were not Federal government action "respecting the evacuation, relocation, and internment" program. Nor was it Federal government action based solely on Japanese ancestry.

Letter of DeDe Greene, Administrator for Redress (Feb. 5, 1999)(emphasis added); AR at 89–90.

The Court is at a loss to explain why the claims were again denied rather than the appeal acted on. We can only surmise that it has something to do with Dr. Obadele's subsequent application for consideration as a "unique case," which resulted in the submission of further documentation by Dr. Obadele. AR 61–83. In any event, all parties have treated this latest rejection of Dr. Obadele's claim as final agency action for purposes of judicial review. *See* Def. Mot. to Dismiss at 21, n 10 (Because Dr. Obadele did not receive the February 5, 1999, letter until February 10, 1999, the Government chose not to assert a jurisdictional defect for failure to exhaust administrative remedies).

Plaintiffs contend that this denial of their claim was "contrary to law" because the ORA relied on the statutory requirement that successful claimants must be of Japanese ancestry, a racial classification that violates the Plaintiffs' constitutional guarantee of equal protection and due process. They ask that we reverse the administrative decision of the ORA, certify the plaintiffs as eligible persons under a constitutional reading of the Act, and require the Attorney General to request that Congress extend the redress program to African-Americans.

## DISCUSSION

### I. Procedural Questions

We agree with Defendant that the ORA cannot be faulted for denying relief it could not provide because of eligibility restrictions explicit in the Act. Clearly, the ORA was created for the class of individuals affected by internment and the other aspects of the emergency action put in force by President Franklin D. Roosevelt during the Second World War. However, in determining whether the ORA's denial of Plaintiffs' claims survives judicial review—whether it was not contrary to law—we are compelled to decide whether the racial classification in the Act complies with constitutional equal protection. Put another way, we unavoidably must address Plaintiffs' primary grievance—Con-

gress' failure to enact similar legislation for African–Americans. We do so mindful of the doctrinal caution that constitutional inquiries should be undertaken only as a last resort. *See Rescue Army v. Municipal Court of the City of Los Angeles,* 331 U.S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947).

Before launching into this equal protection analysis, however, the Court must be satisfied that it has jurisdiction. Initially, the Government placed inordinate emphasis in briefing the jurisdictional issues and paid little attention to either the merits of the case or the constitutional challenges presented. We heard oral argument on the motion to dismiss and soon determined that supplemental briefing was required. We allowed further briefing on the constitutional issues involved in the case, followed by a second hearing on the matter.

Additionally, Defendant indicated that certain fiscal issues may render the case moot because of the lack of further funds to compensate those with legitimate claims under the CLA. This argument and its corollary jurisdictional argument—that there is no money-mandating jurisdictional underpinning for Plaintiffs' claims here—rest on the assumption that the ORA fund has been exhausted with no expectation of being replenished by further authorizations or appropriations for redress payments. At oral argument Defendant set forth this "sunset theory," although counsel candidly conceded that the Department of Justice was looking into modifying its policy on the funding of the ORA.

One question never satisfactorily addressed is whether this Court's Tucker Act jurisdiction is dependent on the money-mandating character of a statute, or on the year-to-year vicissitudes of the appropriations and fiscal processes through which our judgments may be paid. That question is rendered even more uncertain in this case because the duration of the redress program and, consequently, Plaintiffs' substantive right to money, is tied to the availability of funds in the program, and that availability seemingly is affected by any number of technical administrative, accounting, and other

uncertain fiscal events, many subject to actions of the Defendant, the United States.

We note that one case in particular, *Murakami v. United States*, 46 Fed.Cl. 653 (2000), although not binding upon us, addressed the availability of funds argument. Among the things *Murakami* reveals is that the Fund has been replenished after being exhausted, thereby resuscitating an allegedly dead program. The replenishment was authorized by a later appropriation and by administrative reprogramming implemented within the Department of Justice. *See id.* at 654. Moreover, it may not be possible at any particular moment to determine precisely whether funds actually are available. Thus, if the Government is correct in arguing that the Court's jurisdiction turns on the actual availability of funds, the Court could have jurisdiction one moment and not the next, winking in and out of existence, like some jurisdictional quantum particle.

We permitted the Government to supplement its papers to address this point in more detail and to reflect its emerging policy on the availability of redress funds. However, Defendant has added nothing to its analysis of the sunset theory with supplemental briefing except to say that it believes that the decision in *Murakami* was in error.

With the completion of its briefing, the Government argues that the following reasons compel this Court to dismiss Plaintiffs' claims: (1) Plaintiffs cannot establish standing; (2) the Court lacks subject matter jurisdiction to hear these claims; and (3) Plaintiffs have failed to state a claim upon which relief can be granted. Should we take up the merits of the case, the Government argues that the statute is not unconstitutional and that the ORA rightfully denied the Plaintiffs' administrative claims. We address these questions in turn.

## A. Proper Claimants:

■ Pursuant to RCFC 12(b)(1) Defendant brought a motion to dismiss, arguing that jurisdiction is lacking because Plaintiffs are not covered by the Act. Essentially, the Government argues that the statute serving as a jurisdictional underpinning here is not money-mandating, at least not *as it is applied to Plaintiffs*. We reject this argument for a number of equally cogent reasons.

First, although the Complaint invokes this Court's Tucker Act jurisdiction, the CLA, also invoked, contains a specific and exclusive grant of jurisdiction to this Court, and is not dependent on its meeting Tucker Act requirements.

The plain words of the CLA conclusively resolve this issue against the Government: A claimant may seek judicial review of a denial of compensation under the Act solely in this forum. 50 U.S.C. app.· § 1989b–4(h)(1)(2001). In any event, the CLA would itself qualify under the Tucker Act as a money-mandating statute, notwithstanding its explicit provision for judicial review.

Defendant also argues that jurisdiction fails for lack of standing because the Act affords no relief for governmental infringement of African–Americans' civil rights. This blurs the line between eligibility for relief—a merits consideration—and jurisdiction. The classic standing issue exists where some stranger other than Dr. Obadele and his co-plaintiffs sue on their behalf. But the fact that Dr. Obadele, Mr. Rashid, and Mr. Olusegun filed for redress and were denied relief, rightly or wrongly, makes them proper "injured" parties for purposes of standing.

Defendant attempted to clarify its position on subject matter jurisdiction:

> [I]n Plaintiffs' case, the grounds for denial of their claims, i.e., Plaintiffs were not of Japanese ancestry, was also the reason that Plaintiffs could not be claimants pursuant to the Act. Therefore, as we established in our motion to dismiss, because only a claimant could file a complaint with the Court the Court, pursuant to Rule 12(b)(1), lacked subject matter jurisdiction to entertain the complaint.

Def. Supp. Reply at 6.

The Government's logic is circular. The Government confuses eligibility for relief with eligibility *to seek* relief. Our function is to review *denials* of relief. Judicial review would take little of our time if we had jurisdiction only over *successful* applicants. Eligibility for relief under the statute is a

question on the merits, more appropriately resolved via a motion for judgment on the administrative record pursuant to Rule 56.1. Whether a particular claimant is entitled to redress under the statute—whether the denial of a claim is in error—is a question that we adjudge through administrative record review. *See* 50 U.S.C. app. § 1989b–4(h)(1)(Court shall review the denial upon the administrative record and set aside the denial if found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.)

The United States must live with the administrative record it created. It is too late for counsel to argue that Plaintiffs were not "claimants." The ORA—an administrative body within counsel's own organization, the Department of Justice—accepted these claims, processed them, denied them on the merits and even notified the claimants of the established procedures for appeal. *See* Letter of DeDe Greene, Administrator for Redress (Feb. 5, 1999); AR at 89–91. In fact, with Dr. Obadele, the agency officials went to painstaking efforts to ensure that his application was complete. Correspondence and intra-agency worksheets appearing in the administrative record reveal that he was required to submit additional documentation such as a birth certificate, social security records and the like, in order to support his initial declaration. AR at 57—80. Whether or not they are ultimately determined eligible, Plaintiffs were "claimants" and were explicitly treated as such by the ORA.

**B. Sunset Provision:**

■ Finally, Defendant argued a number of theories—mootness, failure to state a claim upon which relief can be granted, and lack of a money-mandating statute—associated with the sunset provision for compensation under the CLA. The Government argues that the unavailability of funds appropriated under the Act terminates the program and the statutory authority to award compensation; it thus deprives the Act of its money-mandating aspect and, consequently, it no longer confers jurisdiction upon this Court.

The trust fund established within the United States Treasury for restitution—the United States Civil Liberties Public Education Fund—was to terminate on August 10, 1998, ten years after the enactment of the statute, or when the appropriation was exhausted, whichever date occurred earlier. 50 U.S.C. app. § 1989b–3(d). By virtue of the 1992 amendments to the CLA, the Attorney General's duties under the Act, originally scheduled to cease upon termination of the Fund, end 180 days after the Fund terminates. 50 U.S.C. app. § 1989b–4(e), Pub.L.No. 102–371, § 5, 106 Stat. 1168. The Act provides that payments must be made only from the Fund created under the program. § 1989b–4(g). Therefore, goes the argument, no other source of monies can replenish the Fund and thus provide the "money-mandating" trigger for Tucker Act jurisdiction.

The Government's attack on the "money-mandating" requirement of the Tucker Act is quite irrelevant. As we have seen, the CLA provides the method by which claimants could demonstrate their entitlement to redress, and explicitly provides for judicial review rights if they were denied redress at the administrative level. This review is independent of the Tucker Act. The judicial review provision contains no termination date for our power of review. The program was open for each claimant who submitted an application prior to the statute's sunset. Once an applicant made a timely claim, as the ORA's treatment of the Plaintiffs' claims demonstrates, he or she became entitled to the procedural rights the statute established, including the right to judicial review. Our review authority persists for all timely but rejected claimants, whether that rejection came before or after "sunset."

Moreover, this "funds" argument of the Government has a number of logical weaknesses which were explored at oral argument. The Government advised the Court that the Department of Justice was re-examining this position, especially in light of issues raised in the *Murakami* litigation. However, the Department failed to advise the Court of any new position, or to respond adequately to questions posed by its theory. Since, for all the Court is aware, the Department may well have abandoned this argument, we would be justified in ignoring it. However,

at the risk of giving it more dignity than it deserves, we will devote some space to it.

We accept as true the following time-line of events: Each Plaintiff filed his initial claim with the ORA before the ten-year anniversary of the Act, although all were very close to the sunset date (Dr. Obadele on August 3, Mr. Rashid on August 4 and Mr. Olusegun on the Fund's expiration date, August 10, 1998.) Their claims were not rejected as untimely. Dr. Obadele's claim was denied days prior to the termination date; Mr. Rashid and Mr. Olusegun received letters denying their claims well after the sunset date. Dr. Obadele formally appealed through administrative channels and his appeal was processed to a decision. The administrative record is silent, but as far as we can tell from the record, Messrs. Rashid and Olusegun did not file an administrative appeal. The Government does not assert this omission as a ground for dismissal.

The Plaintiffs filed a joint complaint in this Court on February 5, 1999, several months after the termination of the original Fund and just two days before the Attorney General's responsibilities under the CLA were to terminate. However, later in 1999, Congress passed the 1999 Emergency Supplemental Appropriations Act, Pub.L. No. 106–31, § 3021, 113 Stat. 57 (1999). Section 3021 of the Appropriations Act gave the Attorney General the discretion to transfer up to $4.3 million in order to pay restitution to eligible individuals who filed a timely claim before the Fund expired. The Attorney General subsequently made the funds available for this purpose in September 1999. *See Murakami v. United States,* 46 Fed.Cl. 653, 654 (2000).

Thus, as we suggested earlier, a program that was apparently dead was resurrected by legislation and an administrative decision of the Attorney General. Presumably, in the Government's view, our jurisdiction over these claims, having disappeared, then magically re-appeared.

But, according to the Government, the emergency appropriations were specifically earmarked for 79 other individuals. They were awaiting documentation to support "legitimate" claims filed prior to the termination date. The new funds, the Government argues, were intended for these other individuals. Of course, if the program had indeed ended with exhaustion of the original appropriation, as the United States contends, these 79 claimants would not have been "eligible" or entitled under the program—the door would have closed to them on the sunset date. And if the door had not closed for them because their claims were pending, would that door not also be open for our Plaintiffs and their pending claims? Is the Department of Justice arguing it can reopen an entitlement program for some applicants, but not others?

Apparently, yes. The Government quite explicitly contends that the 79 applicants whose claims are still unresolved somehow have a preferred legal status over the three other claimants whose claims are also still unresolved. Cast in jurisdictional terms, the Government necessarily argues that because the funds are available for the first group, the statute is still in force as to them, but not as to the second group. Once again, a consequence of this logic is that judicial review is available for the claimants to whom ORA will finally award compensation, but not for those whose claims ORA will deny.

The Government was not able to satisfy the Court in *Murakami* that the technical steps necessary for obligating all the new funds had been implemented. Indeed, the Court expressed doubt whether they had actually been obligated. Of course, if it turns out that any of these intended recipients have defective claims—Voila! The money would again be "available," according to Defendant's representations at oral argument, and our jurisdiction would again attach.

Much of the Government's argument regarding subject-matter jurisdiction is premised on the assumption that our CLA jurisdiction stems from the Tucker Act. Focusing again on the exhaustion of the Fund, the government contends the Act then ceased to be money-mandating. Even were we to assume that this Court's authority for judicial review at any particular moment was dependent on the actual presence of money in the Fund at that moment—a view we reject—the

Congressional replenishment served to restore that jurisdiction for all pending claimants, the 79 and the 3.

In a corollary attack on the Tucker Act's money-mandating requirement, the Defendant contends that the Court is divested of Tucker Act jurisdiction due to the apparent discretion afforded the Attorney General as to whether to reprogram funds under the Emergency Supplemental Appropriations Act of 1999. The 1999 supplemental appropriation authorized the Attorney General to use her discretion as to whether to replenish the Fund. Once she acted, her discretion ended. Henceforth the payment of supplemental appropriations fell under the concededly money-mandating provisions of the CLA.

Each of Defendant's fiscal/jurisdiction arguments were carefully considered and rejected by Judge Allegra's opinion in *Murakami*, 46 Fed.Cl. at 655–60; *see also, Odow v. United States*, 51 Fed.Cl. 425, 431–32 (2001). We do not wish to retread the "labyrinthine and tortuous" route so expertly navigated by that decision. *Murakami*, 46 Fed.Cl. at 656. Suffice it to say, we allowed the Government ample opportunity to convince us that *Murakami* was wrongly decided. They did not even try.

## II. Judgment on the Administrative Record

We turn now to the merits of this case. The Defendant has filed a motion for judgment on the administrative record pursuant to Rule 56.1. When such a motion is made we apply the same standards as for motions for summary judgment. The Court will grant such a motion where there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c). Inferences drawn from the evidence, in this case the administrative record, are viewed in the light most favorable to the party opposing summary judgment. *See Cincom Systems, Inc. v. United States*, 37 Fed.Cl. 663, 670 (1997). We review the denial of Plaintiffs' claims upon the administrative record and hold unlawful and set aside the denial if it is found to be arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with

law. 50 U.S.C. app. § 1989b–4(h)(1). The denial of Plaintiffs' claims and appeals at the Department of Justice survives review under this standard.

As we have stated, the Attorney General is responsible for identifying individuals who qualify for relief and paying them restitution. *See generally,* 50 U.S.C. app. §§ 1989b–4(a). To this end, the ORA was established in the Civil Rights Division of the Department of Justice to administer the program, and to review and approve those claims upon receipt of confirming background information.

This legislation was intended, in part, to recognize "the fundamental injustice of the evacuation, relocation, and internment of United States citizens and permanent resident aliens of Japanese ancestry during WWII." 50 U.S.C. app. § 1989(1). Under the circumstances, the record reveals no evidence of bad faith by the ORA and clearly demonstrates a reasonable and constitutional basis for denial of the Plaintiffs' claims.

These claimants clearly are not entitled to reparations under the statute, *as enacted.* Of course, strict observance of statutory requirements does not ensure that the agency has acted in accordance with law. The actions of agency officials here are only as legitimate as the statute that they followed. Plaintiffs allege that the ORA's denial of their claims on the grounds that they were not of Japanese descent—a basis explicitly authorized and required by the statute and implementing regulations—violates the equal protection clause and the due process clause of the Fourteenth and the Fifth Amendments, respectively.

In connection with this constitutional question, we note that the Government has suggested we lack jurisdiction to decide constitutional issues. Our jurisdiction is preempted in situations where Congress has provided a comprehensive remedy elsewhere. *United States v. Fausto,* 484 U.S. 439, 454–55, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988) (Tucker Act jurisdiction over claim for back pay not appropriate given procedures established under Civil Service Reform Act); *see also Lee v. United States,* 33 Fed.Cl. 374, 380 (1995).

■ The Court's jurisdiction does not ordinarily extend to claims based upon violations of the equal protection clause of the Constitution. *Bounds v. United States,* 1 Cl.Ct. 215, *aff'd without op.,* 723 F.2d 68 (Fed.Cir. 1983). However, once this Court's jurisdiction over a case is established, there is no restriction on our ability to review equal protection, due process or other constitutional claims. *See Terran v. Sec'y of Dept. Of Health and Human Services,* 195 F.3d 1302, 1309–10 (Fed.Cir.1999)(although COFC ordinarily does not possess jurisdiction to entertain constitutional claims such as due process and equal protection, where COFC has proper jurisdiction over the complaint in the first instance, the Court may consider constitutional claims). As in Vaccine Act cases, the statutory jurisdictional basis in *Terran,* review of the denial of a claim before the ORA is a matter over which we have exclusive jurisdiction. 50 U.S.C. app. § 1989b–4(h)(1).

■ The Fourteenth Amendment to the Constitution provides: "No state shall … deny to any person within its jurisdiction the equal protection of the laws." The prohibition applies with equal force to the Federal Government by virtue of the Fifth Amendment's due process clause. *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *Buckley v. Valeo,* 424 U.S. 1, 93, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Legislation inevitably benefits certain persons to the exclusion of others. But such classifications are not necessarily unconstitutional. Equal protection analysis turns on the type of classifications within a statutory scheme. Those classifications which are race-neutral are subject to more relaxed judicial scrutiny, whereas classifications based on race or national origin are subject to strict scrutiny: They must be a necessary and finely tuned means of fulfilling a compelling governmental interest. *See Wygant v. Jackson Board of Education,* 476 U.S. 267, 274, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986).

■ Some may think it odd that a Court must justify under equal protection a measure such as the Civil Liberties Act of 1988 that is designed to redress the Government's constitutional wrongs against a racial class of individuals. Ironically, early equal protection *challenges* to the wartime measures taken against Japanese Americans were afforded less judicial scrutiny than that now required to *sustain* the remedial actions involved here. *See, e.g., Hirabayashi v. United States,* 320 U.S. 81, 102, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943)(upheld curfews under rational basis standard). The constitutional sanction afforded those wartime actions by the Supreme Court is but one element of the wrongs that this statute is designed to atone. *See Adarand Constr., Inc. v. Pena,* 515 U.S. 200, 215 n. *, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995)(noting that Congress had recently agreed with the dissenters' position in *Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944)(upholding exclusion of persons of Japanese ancestry from certain areas) by enacting the Civil Liberties Act of 1988); *see also,* 50 U.S.C. app. § 1989a(a) ("The Congress recognizes that … a grave injustice was done to both citizens and permanent resident aliens of Japanese ancestry by the evacuation, relocation, and internment of civilians during World war II … [T]hese actions were carried out without adequate security reasons and without any acts of espionage or sabotage documented by the Commission, and were motivated largely by racial prejudice, wartime hysteria, and a failure of political leadership.") One may understand—although never condone—the tendency to infringe the liberties of Americans in the name of domestic security in the midst of a crisis atmosphere.

Half a century of equal protection jurisprudence has confirmed the error of that wartime judicial abdication. It has, to be specific, reversed the convictions of Mr. Hirabayashi, Mr. Korematsu and other victims of what was belatedly admitted to be racial prejudice. *Korematsu v. United States,* 584 F.Supp. 1406 (N.D.Cal.1984); *Hirabayashi v. United States,* 627 F.Supp. 1445 (W.D.Wash. 1986), *aff'd in part and rev'd in part,* 828 F.2d 591 (9th Cir.1987).

Time has also shown us that racial classifications that purport to confer benefits on a class of persons must be scrutinized carefully. That should be obvious—a beneficial inclusion of one class on the basis of race also

constitutes exclusion of others on the basis of race. See *Adarand*, 515 U.S. at 241 n. *, 115 S.Ct. 2097 (Justice Thomas, concurring)("It should be obvious that every racial classification helps, in a narrow sense, some races and hurts others. As to the races benefitted, the classification could surely be called 'benign.'")(citing *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 295, n. 35, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978)). That is the core of Dr. Obadele's contention.

Make no mistake, the Plaintiffs have made a powerful case for redress as representatives of a racial group other than Americans of Japanese ancestry. The treatment of African–Americans who were enslaved, oppressed, and disenfranchised is a long and deplorable chapter in this nation's history. Their plight may well be the subject of future legislation providing for reparations for slavery. In fact, the Court is aware that several initiatives have garnered substantial public support. Representative John Conyers (D–MI) has sponsored legislation in every Congress since January 1989 to establish the Commission to Study Reparations Proposals for African–Americans, a commission not unlike that which preceded the enactment of the CLA. Pub.L. No. 96–317, §§ 2, 4, 94 Stat. 964, 965 (1980); *see generally*, Jeffrey Ghannam, *Repairing the Past*, ABA JOURNAL, Nov. 2000, 39; *see also*, Paul Shepard, *Group to Seek Slavery Reparations*, WASH. POST, Nov. 5, 2000, at A11. Some have opted not to wait for legislation. *See* Glenn Kessler, *IRS Paid $30 Million In Credits For Slavery*, WASH. POST, Apr. 13, 2002, at A1 (Internal Revenue Service has paid erroneous refunds for 2000 and 2001 based upon tax returns seeking nonexistent "slavery tax credits.")

Commentators making the case for reparations have, at the same time, forecast the quagmire of difficulties necessarily involved in fashioning the particulars of any such reparations. *See e.g.*, ALFRED L. BROPHY, RE-CONSTRUCTING THE DREAMLAND 103 (2002)("There are, for example, questions about how to apportion the limited public funds that are available. We cannot possibly compensate for each wrong done in the past. So the question becomes, who has the most

compelling claim on the public treasury.")(footnote omitted).

If and when reparations legislation passes, it too will be susceptible to attack on equal protection grounds unless narrowly tailored to redress the undeniably legitimate concerns that Dr. Obadele and his co-plaintiffs have raised. Another group, residents of the Aleutian and Pribilof Islands, also received redress in contemporaneous legislation. *See* Aleutian and Pribilof Islands Restitution Act, 50 U.S.C. app. § 1989c, Pub.L. No. 100–383, Title II, §§ 201–209 (Aug. 10, 1988), 102 Stat. 911 (West 1990). There are, unfortunately, a number of other groups which can make a case for redress of wrongs done them on the basis of political, religious, ethnic, or racial discrimination. For a treatment of the unhappy aspects of American history see Howard Zinn, A PEOPLES HISTORY OF THE UNITED STATES (The New Press 1980).

Federal district courts and presumably this Court as well, faced with a statute that does not withstand an equal protection challenge, may either declare the statute a nullity or may eliminate the offending classification to permit the Plaintiff to qualify. *See Jacobs v. Barr*, 959 F.2d 313, 317 (D.C.Cir.)(citing *Heckler v. Mathews*, 465 U.S. 728, 738–39, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984) and *Califano v. Westcott*, 443 U.S. 76, 89–91, 99 S.Ct. 2655, 61 L.Ed.2d 382 (1979)). Plaintiffs seek the latter remedy. In this forum, the Plaintiffs must make a legal case, which is far different from the political case they would make to Congress. We turn now to the Plaintiffs' legal case, and we are compelled to say they have not persuaded us. Consequently, we need not concern ourselves with the proper remedy.

In *Adarand*, the Supreme Court addressed "benign" or "remedial" racial classifications in the context of federal contracting programs benefitting small business concerns owned by socially and economically disadvantaged individuals. 515 U.S. at 205–212, 115 S.Ct. 2097. Eligibility under the programs was in part based upon racial presumptions. Tracing the history of its review of remedial race-based governmental actions, the Court reached a consensus on the appropriate level of constitutional analysis and confirmed that

all race-based classifications, by any level of government, must survive strict scrutiny. *Id.* at 227, 115 S.Ct. 2097.

The CLA is an example of a "remedial" race-conscious measure—it provides for the administration of a Fund to compensate those of *Japanese ancestry* for injustices resulting from the evacuation, relocation and internment of civilians in the United States during World War II. Therefore, the race-based eligibility guidelines of the ORA "are constitutional only if they are narrowly tailored measures that further compelling governmental interests." *Id.* In applying this standard, the Court must find a factual basis for the conduct being compensated. *See id.* at 229, 115 S.Ct. 2097 ('Unless Congress clearly articulates the need and basis for a racial classification, and also tailors the classification to its justification, the Court should not uphold this kind of statute.')(quoting *Fullilove v. Klutznick,* 448 U.S. 448, 545, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980)). Other factors implicated by strict scrutiny include whether the government considered the use of race-neutral means that serve the same interest. *Id.* at 237–38, 115 S.Ct. 2097 (citing *Richmond v. J.A. Croson Co.,* 488 U.S. 469, 507, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989)), and whether the program was appropriately limited so that "it will not last longer than the discriminatory effects it is designed to eliminate." *See id.* (citation omitted).

As the ORA observed in acting on Dr. Obadele's claim, the CLA has already survived constitutional attack. In *Jacobs v. Barr,* 959 F.2d 313 (D.C.Cir.), *cert. denied,* 506 U.S. 831, 113 S.Ct. 95, 121 L.Ed.2d 56 (1992), an American of German ancestry challenged the redress program on equal protection grounds. The Plaintiff had been interned during WWII but was denied a redress payment because he was not of Japanese ancestry.

The Court of Appeals for the D.C. Circuit upheld the Act. Although the case pre-dated *Adarand's* mandate to extend strict scrutiny to remedial racial classifications, the Court concluded that the CLA survives even this highest level of analysis. *Id.* at 318. It then went on to apply the heightened scrutiny "for demonstrative purposes" and held:

> Congress's finding that Japanese–Americans were the victims of prejudice ... is amply supported by historical evidence that the internment policy extended to Japanese American but not to German–American children. Congress, therefore, had clear and sufficient reason to compensate interns of Japanese but not German descent; and the compensation is ... *narrowly tailored* to Congress's *compelling interest* in redressing a shameful example of national discrimination.

*Id.* at 321–22 (emphasis added). As the Court noted, the Act was aimed at specific governmental actions as opposed to discrimination in general. Persons of Japanese descent who suffered hardship because of governmental action were denied redress payments if their injuries were "not related to any evacuation, internment or relocation program, as required for redress under the Civil Liberties Act." *Kaneko v. United States,* 122 F.3d 1048, 1053 (Fed.Cir.1997).

Plaintiffs fail to explain why we should not be persuaded by the D.C. Circuit's finding of a compelling governmental interest. Nor do they propose that there is any way to compensate the victims of the wartime emergency actions through a less discriminatory alternative. *Wygant,* 476 U.S. at 280 n. 6, 106 S.Ct. 1842. And unlike Mr. Jacobs, they do not challenge the amply supported facts showing the racial motivation and impact of the internment policy. See 50 U.S.C. app. § 1989a. Instead, they condemn "racial politics" and allege simply: "The Act was not attempting to further a compelling governmental [interest] but was a concession to public and political pressure." Although uttered as epithets, the Plaintiffs are really only saying that the victims and heirs of one historical wrong have succeeded in persuading the public and Congress of their entitlement to redress, whereas Dr. Obadele and like-minded advocates are in the process of trying to achieve that same result for another historical wrong.

The D.C. Circuit's analysis and conclusions satisfy the later-articulated tests of the Supreme Court in *Adarand,* and we are persuaded that the Court came to the correct result. We therefore reject Plaintiffs' claim that the ORA denial of their applications was contrary to law because it relied on a consti-

tutionally-defective racial classification. The decision of the ORA is affirmed.

### CONCLUSION

The Government's motion to dismiss, based upon lack of subject-matter jurisdiction and failure to state a claim upon which relief can be granted, is DENIED. Upon exercising our jurisdiction to review the record in this matter, we find the decision of the ORA in denying Plaintiffs' claims for restitution under the Civil Liberties Act of 1988 is supported by the administrative record, and is not arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law. Accordingly, Defendant's motion for judgment upon the administrative record is GRANTED.

The Clerk of Court is directed to dismiss the complaint of the three Plaintiffs in this action and enter judgment in favor of the Government. Each party shall bear its own costs.

IT IS SO ORDERED.